FIRST NATIONAL BANK OF FAIR-
BANKS, Appellant,

v.

William B. CAMP, Comptroller of the
Currency of the United States, et al.

No. 71–1367.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 13, 1971.

Decided June 7, 1972.

Rehearing Denied July 12, 1972.

Mr. Max Barash, Washington, D. C., for appellant. Mr. Robert L. McCarty, Washington, D. C., also entered an appearance for appellant.

Mr. Michael H. Stein, Atty., Dept. of Justice, with whom Mr. L. Patrick Gray, III, Asst. Atty. Gen., Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and Walter H. Fleischer, Atty., Dept. of Justice, were on the brief, for appellee Camp. Messrs. John A. Terry, James F. Rutherford, Asst. U. S. Attys., Morton Hollander, Ronald R. Glancz, Attys., Dept. of Justice, and John V. Austin, Atty., Office of the Comptroller of the Currency, also entered appearances for appellee Camp.

Mr. John D. Hawke, Jr., Washington, D. C., with whom Mr. Irvin B. Nathan, Washington, D. C., was on the brief, for appellee First National Bank of Anchorage.

Before McGOWAN and MacKINNON, Circuit Judges, and GOURLEY,* Senior District Judge for the Western District of Pennsylvania.

MacKINNON, Circuit Judge:

In this suit the First National Bank of Fairbanks (FNB Fairbanks) seeks reversal of a decision of the Comptroller of the Currency (Comptroller) authorizing the First National Bank of Anchorage (FNB Anchorage) to establish a branch office in Fairbanks, Alaska. The case was submitted to the District Court on cross-motions for summary judgment, and the motions of the defendant Comptroller and intervenor FNB Anchorage were granted. We affirm the judgment of the District Court, 326 F.Supp. 541.

## I. BACKGROUND AND FACTS

FNB Anchorage applied to the Comptroller on September 17, 1969 for permission to establish a branch office in the downtown business district of Fairbanks, Alaska. Various supporting data accompanied the application. FNB Anchorage summarized its reasons for applying for the branch as follows:

It is mandatory for this bank to follow the development of its customers

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

in the ever-expanding economy of Alaska, greatly magnified as a result of the great oil activity on the North Slope. In order to do this, this branch must be established.

JA 16.[1] All interested parties were notified of the application and invited to comment; a field investigation was made by a national bank examiner, who recommended approval of the application. Eventually the application was opposed by the State of Alaska, Division of Banking and Securities, by several Fairbanks banks and by the Alaska Association of State Chartered Banks (the Association). The Association and the Alaska State Bank requested the Comptroller to conduct a hearing on the application in order to have "a full opportunity to elaborate upon the reasons for their opposition."[2] JA 107. This request was granted, and the parties were notified of the date set for the hearing and were furnished a memorandum of procedures to be followed during the hearing.[3]

The hearing was held in Portland, Oregon, on March 31, 1970 before the Regional Comptroller, a Regional Econo-

1. The notation "JA" is used herein to refer to the Joint Appendix to the parties' briefs submitted on this appeal; "Tr." refers to the transcript of the March 31, 1970 public hearing on the application, and "AF" refers to the Comptroller's administrative file on the application.

2. The Comptroller's discretion concerning the grant of such a request is broad; 12 C.F.R. § 4.12(d), in effect at the time of subject application, provided that:

the Comptroller of the Currency, in his sole discretion, may, upon request of any interested person or otherwise, order a hearing, either public or private. Such hearing shall be held at the time and place fixed by the Comptroller and shall be conducted by the Comptroller or such other person as he may designate. . . . *A hearing ordered by the Comptroller is not required by statute . . . . Nothing contained herein shall be deemed to require the holding of a hearing by the Comptroller on any matter.* The validity of the Comptroller's determination in any matter shall not be affected because a hearing was not held, whether or not such a hearing was requested by any person . . . .

(Emphasis added.)

The discretionary nature of the Comptroller's hearings has received substantial judicial approval. *See, e. g.,* Sterling Nat'l Bank of Davie v. Camp, 431 F.2d 514, 516–517 (5th Cir. 1970), cert. denied, 401 U.S. 925, 91 S.Ct. 879, 27 L.Ed. 2d 829 (1971) (charter application); Ramapo Bank v. Camp, 425 F.2d 333, 347–348 (3d Cir.), cert. denied, 400 U.S. 828, 91 S.Ct. 57, 27 L.Ed.2d 58 (1970) (branch application); First-Citizens Bank & Trust Co. v. Camp, 409 F.2d 1086, 1089–1090 (4th Cir. 1969) (branch application); Warren Bank v. Camp, 396 F.2d 52 (6th Cir. 1968) (charter application); Citizens Bank of Hattiesburg v. Camp, 387 F.2d 375 (5th Cir. 1967), cert. denied, 391 U.S. 904, 88 S.Ct. 1652, 20 L.Ed.2d 418 (1968) (charter application); Webster Groves Trust Co. v. Saxon, 370 F.2d 381, 384–385 (8th Cir. 1966) (charter application); First Nat'l Bank of Smithfield v. Saxon, 352 F.2d 267, 270 (4th Cir. 1965) (branch application).

Under regulations first announced on February 18, 1971, 36 Fed.Reg. 3123, and adopted on April 10, 1971, 36 Fed.Reg. 6888, 12 C.F.R. §§ 5.1–.14 (1972), a more formal hearing procedure was implemented by the Comptroller, under which hearings are to be held upon the request of "any interested person," or, in the absence of such a request, upon the order of the Comptroller or a Regional Comptroller "when either believes it to be in the public interest." 12 C.F.R. § 5.4 (1972).

3. The Comptroller's regulations at the times relevant here permitted wide latitude in setting these hearing procedures and in conducting hearings; 12 C.F.R. § 4.12 (d) provided:

The person conducting such hearing shall have authority to decide who shall appear as a witness therein, the order of appearance, what testimony, data, or other material or information shall be received in evidence, and all other procedural matters arising during the course of or otherwise connected with such hearing. . . . A hearing ordered by the Comptroller is not required by statute and is not subject to the provisions of the Administrative Procedure Act.

Even under the Comptroller's new procedures he retains a considerable amount of discretion in this area, as evidenced by new 12 C.F.R. § 5.12: "The Comptroller may adopt such different procedures as he deems necessary and reasonable in acting upon any particular application."

mist, and a Senior Attorney from the Comptroller's office in Washington, D. C. The applicant FNB Anchorage was represented by its President and by counsel. Appearing to protest the application were the President of the Alaska State Bank (speaking for both his bank and the Alaska Association of State Chartered Banks) and state Banking Director Robertson (accompanied by one of his Bank Examiners), both represented by counsel. The hearing was directed by the Senior Attorney, Mr. Polking who opened the proceedings by reviewing the procedures set forth in the Regional Comptroller's memorandum announcing the hearing.[4]

Mr. Polking, as senior attorney for the Comptroller, then entered into the hearing record the entire public file, including FNB Anchorage's application with its supporting exhibits and documents (excepting only material of a confidential nature, such as customer lists), and all information and documents submitted by the protestants. Tr. 6–7. FNB Anchorage chose to make only a brief opening statement through counsel, and rested on its application and supporting documents. Though the President of FNB Anchorage was present at the hearing, *no* request was made by any of the participants to examine or otherwise hear testimony from him, and no objections were raised at the hearing to the manner in which FNB Anchorage presented its case. The protestants then presented testimony from eight separate witnesses and introduced documentary evidence in addition to that which had previously been submitted to the Comptroller and included in the public file.

Following the hearing the panel divided in its recommendations on the application. Mr. Mattersdorf, the economist member, recommended disapproval because of the "overbanked" condition of Fairbanks and the questionable economic outlook for the central-Alaska area. AF 88–89. Mr. Polking recommended approval in the belief that the banking market in Fairbanks could support entry by FNB Anchorage without threatening the solvency or profitability of the existing banks, and that FNB Anchorage should be permitted to follow its customers into the Fairbanks area. AF 80. Regional Comptroller Leaf cast the deciding vote against approval, but the closeness of his decision is reflected by the fact that his recommendation adopted all four of the conclusions found determinative by the other two members of the panel. AF 72. His recommendation to disapprove seemed almost inconsistent with his analysis of the arguments.

Disagreement continued after the application was forwarded to the Comptroller's office in Washington, D. C. There the Director of the Bank Organization Division recommended approval; two Deputy Comptrollers recommended rejection; and on June 26, 1970 the Comptroller rejected the application. By letter of June 30, 1970 FNB Anchorage was informed that their application had been denied. AF 55.

On September 4, 1970 FNB Anchorage requested reconsideration of the decision on the basis of the merits of the original application. No new grounds nor changed circumstances were alleged, but the argument was again advanced that FNB Anchorage "can never truly be competitive with the National Bank of Alaska [who] can continue to take customers away from this bank as long as we are denied serving the Fairbanks area. . . ." JA 12, AF 47.

Additional comments were then solicited from those who had opposed the application at the March 31 hearing. The State Banking Director, Alaska State Bank, and FNB Fairbanks filed protests that argued, in essence, that the only significant change occurring since the initial rejection of the FNB Anchorage application was further deterioration

---

4. No objection to these procedures was raised by anyone either at this time or at any time prior to the commencement of the hearing. See Part III of this opinion in which appellant's procedural complaints in this suit are discussed.

in the economic prospects for the Fairbanks area.

A new Regional Comptroller, Mr. Selby, wrote an extensive letter to the Comptroller on October 13, 1970 summarizing his view of the relevant factors and recommending approval of the application. JA 151–55, AF 15–21. He, too, noted that Fairbanks seemed to have "an adequate number of banking offices," but he was more impressed by the facts that 83% of the commercial bank deposits in the area were held by the two Fairbanks-based national banks, that a nine-month-old branch of the other major Anchorage-based national bank had been successfully accepted in Fairbanks without any perceptible detrimental effect on the existing Fairbanks banks, and that applicant had a valid claim to protect existing customers. Mr. Selby concluded that these competitive factors weighed most heavily in favor of approval.

During the week of October 19 Mr. Selby visited Anchorage and Fairbanks in order to become "personally acquainted with the banking and economic factors prevalent in [Alaska]." As a result of this visit, he wrote the Comptroller further on October 30: "I have become more fully convinced of the soundness of the arguments presented by [FNB Anchorage] in defense of its application to enter Fairbanks . . . . " JA 157–58, AF 12–13.

Mr. Selby's analysis was favorably received in the Office of the Comptroller, convincing the two Deputy Comptrollers who had previously recommended against approval to change their minds. The Director, Bank Organization Division, again cast his vote for approval, which made the staff recommendation unanimous.[5] Comptroller Camp, on November 6, joined by approving the application, JA 159–60, AF 10–11, and FNB Anchorage and the protesting parties were notified of this approval by letters dated November 10 and 12, 1970. AF 7–9.

By separate correspondence on December 1, FNB Anchorage was reminded that approval was contingent upon using a "distinctive designation" to prevent the confusion inevitable from having two "First National Banks" serving the same area. FNB Anchorage replied on December 18 with a proposal to use and emphasize the name "Interior City Branch" in connection with their Fairbanks operation. The Comptroller approved this designation on December 23, 1970, JA 161, 164–65, AF 1–2, 5.

This action was filed by FNB Fairbanks against the Comptroller on December 18, 1970 seeking review of the Comptroller's actions and a declaratory judgment that his approval of the application was "arbitrary, capricious and unreasonable and an abuse of his discretion" and that the approval was therefore "null and void and of no effect." JA 15. FNB Anchorage was granted leave to intervene as a defendant, and both defendants moved to dismiss or in the alternative for summary judgment; FNB Fairbanks filed a cross-motion for summary judgment. The District Court granted defendants' motions for summary judgment and this appeal followed. We affirm the judgment of the District Court.

## II. THE ROLE OF STATE LAW IN NATIONAL BANK BRANCH APPLICATIONS

The appellant, FNB Fairbanks, urges as its primary grounds for reversal that the Comptroller acted arbitrarily and in abuse of his discretion by failing to follow the provisions of state law that are to govern his decision when acting on branch applications from national banks.

The authority to approve branches of national banks was initially given the Comptroller by Section 7 of the McFadden Act,[6] and appears now, as amend-

---

5. The Chief National Bank Examiner did not vote (AF 10).

6. Act of February 25, 1927, ch. 191, § 7, 44 Stat. 1228. Initially branches were limited to the same locality, but in 1933 statewide branching was authorized where state law authorized such branches for state banks. Act of June 16, 1933, ch. 89, § 23, 48 Stat. 189–90.

ed, in 12 U.S.C. § 36 (1970) (Emphasis added):

> (c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: . . . (2) at any point within the State in which said association is situated, *if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively* and not merely by implication or recognition, *and subject to the restrictions as to location imposed by the law of the State on State banks.* . . .
>
> \* \* \* \* \* \*
>
> (e) No branch . . . shall be established . . . without first obtaining the consent and approval of the Comptroller of the Currency.

In First National Bank of Logan v. Walker Bank & Trust Company, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966), the Supreme Court found in this statute and its legislative history a congressional intent "to place national and state banks on a basis of 'competitive equality' in-sofar as branch banking was concerned." *Id.* at 261, 87 S.Ct. at 497.

■ The doctrine of "competitive equality" results from this country's unique "dual banking system," under which wholly independent state and national chartering authority have grown up together.[7] In cases where conflicts of state and federal supervision arise, as here, we must pay close attention to the congressional design for resolving that specific conflict. In the context of branch banking the "competitive equality" mandated by the statute focuses on the competition for expansion opportunities within each state between individual national- and state-chartered banks. The congressional policy adopted places the competing banks on an equal footing— hence "competitive equality"—by requiring that national banks are to be subject to the same statutory restrictions on branch establishment as are the state banks in each state.[8] Any ambiguity as to the totality of this national deference to state law was resolved in Walker Bank, *supra,* 385 U.S. at 261, 87 S.Ct. at 497:

> It appears clear from this résumé of the legislative history of § 36(c) (1) and (2) that Congress intended

---

7. Our "dual system" arose largely by historical accident, since

the National Bank Acts of 1863 and 1864, and the related ten per cent "death tax" imposed by Congress in 1865 on the note issues of state-chartered banks, were intended to provide a sound and uniform national currency by (1) eliminating state-chartered banking (and thus the issuance of state-bank notes), and (2) providing for a *single system* of federally chartered national banks to issue new national bank notes. Kreps, Modernizing Banking Regulation, 31 J.Law & Contemp.Prob. 648, 649 (1966) (emphasis in original) (footnotes omitted). This combination of legislation did succeed in eliminating state-bank notes, but, wholly unexpectedly, demand deposits replaced bank notes as the primary means for money creation and new life was breathed into the state banking systems.

8. Congressman Luce, one of the conferees on the state-wide branching bill in 1933, stated with respect to unit and branch banking: "[T]he two ideas shall compete on equal terms." 77 Cong.Rec. 5896. In 1941 the Michigan Supreme Court expressed the same idea: "[T]he thought was to place both banking systems upon an *equal competitive plane.*" Rushton ex rel. State Banking Commissioner v. Michigan Nat'l Bank, 298 Mich. 417, 299 N.W. 129, 134 (1941) (emphasis added). This was a quo warranto action in state court to test the authority of the Michigan National Bank to operate certain branches.

The significance of this deference to state law is perhaps best illustrated by the remarkable diversity between states in their approach to branch banking. In 1970 only 19 states permitted state-wide branch banking; 16 states permitted branching on a limited basis; and 15 states either prohibited branching entirely or severely restricted it. U. S. Bureau of the Census, Statistical Abstract of the United States: 1971, at 437 (92d ed. 1971).

to place national and state banks on a basis of *"competitive* equality" insofar as branch banking was concerned. . . . It is not for us to so construe the Acts as to frustrate this clear-cut purpose so forcefully expressed by both friend and foe of the legislation at the time of its adoption. . . .

> . . . It is a strange argument that permits one to pick and choose what portion of the law binds him. Indeed, it would fly in the face of the legislative history not to hold that national branch banking is limited to those States the laws of which permit it, and even there "only to the extent that the State laws permit branch banking." (Emphasis added.)

Three years later, in First National Bank in Plant City v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969), the Court repeated the same thought while dealing with the related problem of the definition of a branch in Section 36(f) of Title 12 U.S.C.:

> The policy of competitive equality is therefore firmly embedded in the statutes governing the national banking system. The mechanism of referring to state law is simply one designed to implement that congressional intent and build into the federal statute a self-executing provision to accommodate to changes in state regulation.

396 U.S. at 133, 90 S.Ct. at 343. Thus, the statute and these decisions establish that the Comptroller's consideration of branch applications by national banks must be guided and controlled by the appropriate state's law on branch banking.

Appellant here argues that the Comptroller did not properly consider Alaska's laws on branching when he approved FNB Anchorage's application to estab-lish a branch in downtown Fairbanks. This argument proceeds along two separate lines: First is the contention that the opinion of Mr. Robertson, Director of Alaska's Division of Banking and Securities, constitutes an official expression of state policy, and as such is a part of the state law by which the Comptroller is bound in his decision. Thus, since Mr. Robertson repeatedly and forcefully opposed this application, appellant contends that the Comptroller's approval was arbitrary and an impermissible abuse of his discretion. Secondly, FNB Fairbanks contends that the substantive requirements of the Alaska statutes governing branch banking were arbitrarily and capriciously ignored by the Comptroller in approving this application. We will consider each of these allegations in turn.

### A. The Banking Supervisor's Opinion as State Law

Appellant bases his principal argument, that the Comptroller's discretion to approve this application is constrained by Mr. Robertson's views and opposition, upon a broad reading of the language from *Dickinson* "that a 'branch' may be established only when, where, and how state law would authorize a state bank to establish and operate such a branch . . . ." 396 U.S. at 130, 90 S.Ct. at 341. Paraphrasing this language, appellant asserts that "[i]f a state bank does not qualify under state law to establish a branch bank in Fairbanks —a fortiori, neither does a national bank qualify." Brief for appellant, at 23. Since State Banking Director Robertson has repeatedly stated that his assessment of economic and banking conditions in Fairbanks would preclude his approving a branch application from any state bank,[9] appellant's argument concludes that no state bank and, a fortiori, no national

---

9. *See, e. g.*, Mr. Robertson's testimony at the Comptroller's hearing in Portland:

> Q. If on this date or at the time the First National Bank of Anchorage filed its application for Fairbanks, a state chartered bank, one of the banks in your system, were to file an applica-tion for a branch operation in the City of Fairbanks, would you grant it or deny it and if so, why?
>
> A. . . . [W]e would deny it because we believe Fairbanks is over banked.
>
> Tr. 85.

bank "qualif[ies] under state law to establish a branch bank in Fairbanks."

In its simplest terms, appellant's argument is that the opinion of the state supervisor as to the application of the state law constitutes an expression of official state policy that is as binding on the Comptroller as any other provision of the "statute law of the state," 12 U.S.C. § 36(c). This proposition is a novel one, and neither party has been able to cite case authority precisely on point. Our reading of the most closely analogous cases, as well as our understanding of the purpose of Section 36(c), leads us to a more restrictive view of the *Dickinson* language than that urged upon us by appellant.

■ Appellant cites two cases in support of this argument; Nuesse v. Camp, 128 U.S.App.D.C. 172, 385 F.2d 694 (1967), and Jackson v. First National Bank of Valdosta, 349 F.2d 71 (5th Cir. 1965). Both cases involved attempts by state banking supervisors to prevent branch establishment by national banks within their respective states, and the holding of both cases was that the supervisors had standing to sue in opposition to new national bank branches. Appellant FNB Fairbanks would convert this acknowledgment of the state supervisors' *interest in litigation* contesting national bank branching into a recognition of the supervisors' *substantive opinion* on the legality of the branch application as a component of the controlling state statute law on branching. These two cases do not support such an extension of their holding. They merely hold that state banking supervisors, by virtue of their official position, have standing to oppose the establishment of branches of national banks they consider to be violative of the applicable federal and state law. To permit a state banking supervisor "to appear as a party to urge the construction of the federal statute that he claims is necessary to secure the state's interests," Nuesse v. Camp, *supra*, 128 U.S. App.D.C. at 179, 385 F.2d at 701, is a far different proposition than the appellant's assertion that the State Commis-

sioner's oral opinion applying state law to a specific factual situation is binding upon the Comptroller and this court. We decline to so hold.

To the same effect is our decision in Union Savings Bank of Patchogue v. Saxon, 118 U.S.App.D.C. 296, 335 F.2d 718 (1964) and two District Court cases. In *Patchogue, supra,* the Comptroller had authorized a national bank to establish a branch in an "unincorporated village," utilizing a New York Banking Department interpretation of the meaning of that term. The District Court granted summary judgment in favor of the Comptroller in a competing bank's suit to block the branch. We reversed, saying:

> Since we are of the opinion that the § 36(c) reference to "the statute law of the State" includes legislative enactments and not administrative interpretations of those enactments, the New York Banking Department's view of § 105 of the New York Banking Law would not be authority for the establishment of the Tinker branch.

Two District Court cases also hold that state administrative views are not to be considered controlling. In South Dakota v. National Bank of South Dakota, 219 F.Supp. 842 (D.S.D.1963), aff'd, 335 F.2d 444 (8th Cir. 1964), a *rule* of the South Dakota State Banking Commission prohibiting the establishment of a branch bank more than fifty miles from the home office would have precluded establishment of a branch in the location sought by the defendant national bank. This rule was found to be an "invalid . . . attempt . . . to exercise legislative power," contrary to the state's branching statute and it was therefore held inapplicable to the national bank since Section 36(c) incorporates only the statute law of the state.

Similarly, Leuthold v. Camp, 273 F. Supp. 695 (D.Mont.1967), aff'd per curiam, 405 F.2d 499 (9th Cir. 1969), rejected a formal opinion of the Attorney General of Montana, which the Superintendent of Banks of the state considered binding upon himself. The court concluded: "If the administrator of the

state law sees fit to deprive the state banks of rights which the statute law [of the state] gives them, the resulting inequality is created by administrative fiat and not by statute law." 273 F. Supp. at 701.

Though in each of these cases the opinion of the state supervisor was rejected, they cannot properly be read to support appellee's proposition that the state supervisor's opinion must always yield to a contrary view held by a federal court or the Comptroller. In each instance, the rejection was based on a finding that the supervisor's views were in conflict with the statute law of the state. However, where such a conflict is found, it makes no difference whether it is the state supervisor's or the Comptroller's opinion that is involved; a fair reading of the statute law of the state, as incorporated within the National Bank Act by Section 36(c), must determine whether or not branching is proper.

Despite *Walker Bank* and *Dickinson*, the Comptroller apparently continued to resist the notion that he, too, was bound by the statute law of the states. In both First-Citizens Bank and Trust Company v. Camp, 409 F.2d 1086 (4th Cir. 1969) and First National Bank of Catawba County v. Wachovia Bank & Trust Company, 325 F.Supp. 523 (M.D.N.C.), aff'd per curiam, 448 F.2d 637 (4th Cir. 1971), the Comptroller argued that he was not bound by the "need and convenience" and "solvency of the branch" criteria of North Carolina's banking laws. The District Court in *Wachovia* vividly expressed his displeasure at this continuing recalcitrance:

> Throughout his opinion, the Comptroller argues at great length as to why the pronouncements of the United States Supreme Court in the *Walker Bank* case and the holdings of the district court and the Court of Appeals in the *First Citizens Bank* case are unsound law and attempts to rationalize his reasons for ignoring these decisions. . . . He ends his opinion by stating that he declines to make findings with respect to "needs and convenience" criteria "as required of the State Banking Commissioner by Section 53-62(b) of the North Carolina General Statutes." Having arbitrarily and capriciously elected to ignore clearly defined principles of law, it follows that the opinion of the Comptroller approving the application of Wachovia is a nullity. . . .

Taken together these cases establish only that where either the state or federal administrator's opinion conflicts with the statute law of the state that opinion must be rejected. Where the state supervisor and the Comptroller have reached conflicting opinions on a branch application because of their conflicting interpretations of the state branching statute, a situation which we believe to exist here, we are confronted with a different factual situation than in any of these other cases. We are bound by Section 36 and its policy of "competitive equality" in seeking to resolve this conflict.

By its express terms, Section 36 makes branch establishment by national banks contingent upon the "consent and approval of the Comptroller." 12 U.S.C. § 36(e) (1970). Thus if our conflict of views as to the proper construction of the applicable statutes arose in the setting of a state supervisor's opinion favoring the branch and the Comptroller opposing it, presuming of course that both views were in accord with the state's statutory requirements, Section 36(e)'s requirement of the Comptroller's approval for any branch of a national bank would clearly result in denial of the branch application. In part this is due to a procedural obstacle; the Comptroller could not be forced to approve the branch because his action would be within the scope of his discretion protected from mandamus or the normal standards of judicial review. Another aspect, however, is that there is authority for the view that the Comptroller's interpretation of the state statute is, under Secion 36, purely a question of federal law—that for the purpose of approving national bank branches not even

state judicial interpretations of the state statute would control the federal interpretation. Howell v. Citizens First National Bank of Ridgewood, 385 F.2d 528 (3d Cir. 1967).[10]

■ The purposes of Section 36(c) lead us to a similar result where we are faced with a conflict in which the state supervisor protests and the Comptroller approves a national bank branch application upon what we find to be a sound interpretation of federal and state law. The "competitive equality" of Section 36(c) is an equality of opportunity for expansion. Under its provisions the state statutory restrictions on branching were intended by Congress to apply equally to state supervisors in approving branches for state banks and to the Comptroller in approving branches for national banks. To accept the appellant's view would be to impose the additional restraint on national banks of a veto power in the hands of the state supervisor.

■ Appellant argues that since state banks must obtain the state supervisor's approval, giving him that veto power over national banks equalizes branching opportunities between the two. That would not be equality of opportunity. Moreover it is not required by the applicable federal statute. Section 36 (c) provides:

a national banking association may, with the approval of the Comptroller . . . establish . . . new branches . . . if such establishment [is] authorized to state banks by the statute law of the state in question.

Insofar as this provision is concerned, the authority of the Comptroller to approve any branch depends on the *existence* of a state law in which branches are "authorized"; it in no way requires the additional approval of the official administering the state banking statute, even where the state statute requires such approval for branches of state banks.[11]

■■ If the Comptroller could exercise a veto power over state bank branching similar to that here claimed for the Alaska supervisor by appellant, *then,* if competitive equality were the sole standard, both state and national banks would be equally constrained by the requirement of joint approval by both the state supervisor and the Comptroller. Such a result would achieve the equality of expansion opportunity sought by Section 36(c), but it would totally destroy the *competitive* aspect that lies at the heart of both Section 36(c) and our "dual banking system." Both the statutory language of Section 36(c) and the competition component of the doctrine of

10. Howell, the New Jersey Commissioner of Banking, sought to enjoin approval of a national bank branch, arguing that its establishment would violate the applicable provision of New Jersey law. The trial court invoked the abstention doctrine and entered an order staying proceedings pending initiation of an action in the state courts to decide the challenged question of state law. The Third Circuit reversed, holding:

[T]he determination of the extent of the application of a state branch banking statute to a national bank under the federal Banking Act of 1933 is purely a question of federal law, a question to be decided by reading the state statute through lenses prescribed by the the Congress. A decision by the state courts as to the meaning and application

of a state branch banking statute would not be conclusive on the federal courts as to this federal question and might be wholly irrelevant.
385 F.2d at 530.

11. We do not interpret the subsequent phrase, "and subject to the restrictions as to *location* imposed by the law of the State on State banks" (emphasis added) as adding anything other than a requirement to comply with those provisions of the state statutes that restrict the physical location of branches. Such limitations on location are frequently woven around political subdivisions, mileage limits, "home office protection" of competing banks, etc. This clause of Section 36(c) merely adopts these geographical limitations for national banks.

"competitive equality" require that neither state nor federal administrator be empowered to veto branch authorizations of the other. The state supervisors apply their state statutes in evaluating state bank branch applications wholly independently of any federal supervision, and we hold that the Comptroller may similarly apply those same state statutes in evaluating national bank branch applications independently of control by the opinions of the state supervisor.[12]

This interpretation satisfies the requirements of Section 36(c) and its underlying principle of competitive equality. Both the state supervisor and the Comptroller are bound to follow the state branching statute; it is the language of that statute that controls. Neither state nor federal administrators may circumvent its dictates by unsound opinions or practice. State opinions interpreting their branching laws are to be considered by the Comptroller, but whether they are to be followed depends upon their conformance with the "statute law of the state in question."[13] The Comptroller's obligation is to weigh each branch application against the standard imposed by the statute law of the state, and to deny the application if that standard is not met.

### B. The Requirements of Alaska Law

As hereinbefore described, in order for the Comptroller's approval of FNB

Anchorage's branch in Fairbanks to be valid, the requirements of the Alaska Banking Code concerning branching must be met. In this case there is no specific finding anywhere in the record that the Comptroller found that the application complies with the Alaska Banking Code.[14] In the face of this failure to make an express finding that the application complies with the most basic requirement of Section 36(c) and the Supreme Court's *Walker Bank* and *Dickinson* decisions, we have been extremely careful in scrutinizing the administrative record here for evidence that the Alaska Banking Code's requirements have been met. It is only our conviction that there is substantial evidence in this record supporting the conclusion that the "statute law" of Alaska concerning branch banks has been complied with that permits us to affirm the District Court's summary judgment in favor of the Comptroller.

The Alaska Banking Code imposes two restrictions on branching that the appellant contends were not met in FNB Anchorage's application for a branch in Fairbanks. These are that "the addition of the proposed facilities in the community is not detrimental to a sound banking system," and that "the name is not deceptively similar to that of another bank in the proposed community or otherwise misleading."[15] Each of these requirements will be considered in turn.

---

12. We interpret the *Jackson* and *Nuesse* opinions as being limited to the procedural aspects raised therein. Clearly the state supervisor has an interest in the Comptroller's interpretations of the state statute, for where the Comptroller's and state supervisor's views differ an inequality of expansion opportunities may conceivably arise. To forestall this result the state supervisor must be granted a forum in which to argue that the Comptroller's view does not comport with the state statute. We hold only that where the Comptroller's view is found to be consistent with the federal and state statutory restrictions, a contrary opinion of the state supervisor does not constitute an absolute bar to the Comptroller's approval of a national bank's branch application. Rushton v. Michigan Nat'l Bank, *supra*

note 8, is an interesting state case to this effect.

13. Leuthold v. Camp, 273 F.Supp. 695 (D.Mont.1967), aff'd per curiam, 405 F.2d 499 (9th Cir. 1969); South Dakota v. National Bank of South Dakota, 219 F.Supp. 842 (D.S.D.1963), aff'd, 335 F.2d 444 (8th Cir. 1964).

14. *Cf.* First-Citizens Bank & Trust Co. v. Camp, 409 F.2d 1086 (4th Cir. 1969); First National Bank of Catawba County v. Wachovia Bank & Trust Co., 325 F.Supp. 523 (M.D.N.C.), aff'd per curiam, 448 F.2d 637 (4th Cir. 1971).

15. Alaska Stat. §§ 06.05.415(1), (3) (1962):
The department shall issue a certificate of authority to operate a branch bank,

1. *The "sound banking system" standard.*

It is evident here that the state supervisor and the Comptroller have conflicting views as to whether the "sound banking system" criterion has been met. The parties have all conceded that there is no existing administrative or judicial interpretation of this section of the Alaska Banking Code, so that both the state and national bank administrators approached this statutory requirement with no previous interpretive gloss on the meaning of a "sound banking system." By enacting such a broad and subjective standard as this, the Alaska legislature obviously intended to leave a great deal of room for the exercise of administrative discretion in applying the standard. And since this provision was enacted in 1951,[16] the legislature was well aware that under existing federal law [17] the state statute would also serve as the basis for the establishment of branches of national banks. Once a state legislature has authorized branches for state banks they have opened the door to competition between unit and branch banking for both state and national banks. It is only natural that the state and national bank administrators, with their very different responsibilities and frames of reference, might develop different perspectives on what might be determined to be a "sound banking system." We believe that in the context of our dual banking system, the congressional policy of competitive equality embodied in Section 36(c) requires that we respect these differing perspectives in determining whether so broadly discretionary a requirement as is here involved has been met.

Alaska Banking Director Robertson's construction of a "sound banking system" can be deduced from his testimony at the Regional Comptroller's hearing and his documentary submissions included in the administrative record. His principal concern with Alaska's banking system appears to be concentration of banking resources.[18] Of the ten commercial banks in the state at the end of 1969, the two largest, National Bank of Alaska and FNB Anchorage respectively, held nearly 60% of the state's commercial bank deposits and operated 38 of 69 banking offices. Accentuating this concentration, in Mr. Robertson's opinion, is the smallness of the remaining eight commercial banks (none of them held as much as 50 million dollars in deposits), and the fact that the size and remoteness of Alaska itself are significant obstacles to expansion for the smaller banks.

It is also apparent that Mr. Robertson's interpretation of a "sound banking system" would include a more nearly equal asset balance between the national and state banks. His initial documentary submission to the Comptroller to protest this application included the following:

We recognize that many areas of Alaska are now approaching an era of unprecedented growth and expansion.

---

or to operate the principal office of a bank or a branch bank in a changed location, if

(1) the department determines that the addition of the proposed facilities in the community is not detrimental to a sound banking system;

\* \* \* \* \*

(3) the name is not deceptively similar to that of another bank in the proposed community or otherwise misleading.

16. Session Laws of Alaska, 1951, March 26, 1951, ch. 129, § 3.221E.

17. Since February 25, 1927 federal laws have conditioned authority to establish new branches of national banks upon the right of state banks to establish branches under "the law of the state in question." Act of Feb. 27, 1927, ch. 191, § 7, 44 Stat. 1228, as amended, 12 U.S.C. § 36 (1970).

18. Virtually all of his substantive comments in his direct testimony at the hearing were directed toward the issue of the banking structure of the state. Tr. 58–63. *See also* AF 302–304. When we recognize that the total population of Alaska in 1970 was only 294,607, the absence of numerous financial institutions does not appear to be unusual.

We also recognize that as resource development and general business activity increases and population expansion actually occurs, the resulting financial needs must be served. We view these favorable prospects as an excellent opportunity for the chartering authorities to create a "balanced" banking system and to begin to correct the imbalance between state and national banks which exist [*sic*] at the present time.

In making this adjustment, it would be incumbent on the chartering authorities to move cautiously considering only that development which has actually occurred, or is eminent [*sic*]. We believe progress toward a *balanced system* can be made by not allowing any bank to move into those areas showing only "future promise" and, in effect, pre-empting competition. [Emphasis added.]

AF 301. In his testimony at the hearing Mr. Robertson repeated this theme, while implying that the statutory requirement of a "sound banking system" imposed on him in his official capacity the role of a promoter of state banks:

Q. Do you think that the state banks in Alaska should have an opportunity now to expand to a point where they can catch up, so to speak, with the larger National Banks in Alaska?

A. . . . I think they should not be precluded by any premature expansion by banks who feel that they are in a position to do it.

Q. Well, you would like to see the state banks catch up, so to speak, would you not?

A. Certainly. *As a state supervisor concerned with promoting and maintaining a sound banking system we have to be concerned with this.*

Tr. 65–66 (emphasis added).

Mr. Robertson's application of this rationale to the application involved here is explained by another of his general comments:

State banks are studying the growth areas throughout the State and are prepared to move into those where economic justification is evident. It is our concern that they will not [*sic*—intended to read "will"?] be precluded from doing so simply by national banks moving into "promising" areas well in advance of actual development. In this connection, we believe it is important to realize that although the future appears bright, comparison of key statewide economic indicators show rather modest rates of expansion.

AF 301. Mr. Robertson's evidence on the economic prospects for Fairbanks suggests that it is indeed a "promising area," but an area whose promise is clouded by the uncertainty accompanying the unresolved questions concerning development of the Alaskan North Slope oil fields. AF 23–42, 338–47. This economic analysis, coupled with the fact that the Fairbanks area ratio of population to existing banking offices was far lower than the statewide average (Alaska's statewide average is itself one of the lowest in the nation), prompted Mr. Robertson to conclude that "there are already too many banks for the size of the city. . . . I feel very strongly that [the] proposed new [branch] would seriously jeopardize all existing banks in Fairbanks and make it exceedingly difficult for them to compete there and elsewhere." Tr. 62.

Mr. Robertson, both on cross-examination and in response to questions from the hearing panel, strenuously resisted suggestions that his position implied a recommendation for placing a moratorium on national bank branch approvals. Tr. 64–70, 86–88. However, we find it difficult to understand how Mr. Robertson would accomplish his "catching-up" without providing state banks with some competitive advantage in the exploitation of expansion opportunities. From his entire testimony it is apparent that he interprets the "sound banking system" standard to mean a "sound *state* banking system," but that view appears to us to lead to a

result inimical to the policy of competitive equality that underlies Section 36 of the National Bank Act. The fact that state banks may be precluded by capital inadequacy or managerial weakness from exploiting expansion opportunities into "promising" but not-yet "developed" areas should not constrain national banks better able to withstand such risks from doing so. A defect, however, in Mr. Robertson's approach is that the standard of a "sound banking system" is not necessarily related to the size of either the state or national system. The relative amount of assets in either system is not a determining factor of the soundness of the banking system where state and national banks exist and operate side by side.[19]

The Comptroller's interpretation of the parameters of Alaska's "sound banking system" standard is understandably colored by considering Section 36 competitive equality and his personal responsibility for supervising national banks. He, too, is cognizant of the dominance of the two largest national banks in the Alaskan banking structure.[20] However, having previously authorized a branch of the National Bank of Alaska —the larger of the two—in Fairbanks, one factor weighing heavily in favor of granting this application was to provide FNB Anchorage the opportunity to continue its head-to-head statewide competition in the Fairbanks area.[21] Another competitive factor was the nearly complete domination of the Fairbanks banking market by two other national banks —appellant FNB Fairbanks and Alaska National Bank of Fairbanks—who together hold 83% of the commercial bank

19. Comparative national banking statistics are interesting in this regard:

Commercial Banks—1970

| Banks | Number | Banking Offices | Assets ($ billions) |
|---|---|---|---|
| By type | | | |
| National banks | 4,621 | 17,157 | 340.8 |
| State banks | | | |
| Federal Reserve members | 1,147 | 4,802 | 125.5 |
| Non-member, FDIC insured | 7,735 | 13,139 | 106.5 |
| Non-insured | 184 | 433 | 4.4 |
| By state branching laws | | | |
| States with statewide branching | 1,306 | | |
| States with limited branching | 4,941 | | |
| States with no branching | 7,440 | | |

U.S. Bureau of the Census, Statistical Abstract of the United States: 1971, at 435, 437 (92d ed. 1971).

———◆———

20. The economist member of the hearing panel had written:

Other states show even greater duopoly control of the commercial banking industry (e. g. Oregon). But I question whether such high concentration ratios should be encouraged or countenanced by the Comptroller if they are only now developing. While we have no guidelines regarding the upper limits of appropriate market shares by a state's two largest banks, I believe that such limits—however undefinable—should be considered. The NBA and FNB Anchorage may, jointly, have reached them.

AF 85.

21. Prior disapproval by the Comptroller of FNB Anchorage branch applications at Kenai (1967) and Fairbanks (1965, 1970), while National Bank of Alaska was successful in having branch applications approved at both locations (AF 17–18), may have indicated a prior prejudice or favoritism that the Comptroller sought to correct. Since 1960 the National Bank of Alaska has had 13 branch applications approved by the Comptroller and one disapproved; FNB Anchorage has had 4 approved and 4 disapproved (AF 17, 19, 20).

deposits in the area. AF 17. A branch of FNB Anchorage promises to bring new competition to banking in Fairbanks.

 Another of the Comptroller's standards for evaluating the soundness of the Alaskan banking system is his evaluation of the soundness of individual banks, and here again the scale tips in favor of this application. The economist member of the hearing panel hinted at this factor as follows:

> The unstated case for the FNB Anchorage's proposed branches is twofold: . . . and (perhaps also) to put pressure on one or both of the established National banks in Fairbanks which have required exceptionally close supervision by the Regional Administrator because of various deficiencies in management.

AF 88. This argument was no longer "unstated" upon reconsideration of the application. Mr. Selby, the new Regional Comptroller, included in his recommendation for approval a comment upon the asset, managerial and capitalization problems of the two local national banks. AF 17. Following his visit to Fairbanks shortly after writing his initial comments, Mr. Selby wrote again:

> The First National Bank of Anchorage will meet stiff competition from the two Fairbanks-based banks . . . . The First National Bank of Fairbanks and the Alaska National Bank have a definite advantage in the city, and there is no basis for sheltering them from further competition, although both have certain asset and managerial problems.

AF 12. Perhaps increased competition will cause changes that resolve these problems; perhaps there will be no significant change at all and the Fairbanks market will be able to support both the stronger and weaker banks. Whatever the end result, we see illustrated here the Comptroller's concern with the soundness of management of individual national banks, which must surely be considered a reasonable component of the

Alaska statute's "sound banking system." It is apparent that the Comptroller interprets the statute to mean a "sound banking system *for the state*," an interpretation which we consider to more nearly conform to the legislative intent.

Next, we note the record reflects that the members of the staff of the Comptroller's office who considered the branch application found that its approval would not adversely affect the Fairbanks banks. Staff members so finding included: the bank examiner who made the initial investigation, JA 145, AF 69; the Regional Comptroller, AF 72, see also JA 147; Mr. Polking, the hearing panel member, JA 135, AF 80; and Mr. Selby, the new Regional Comptroller, AF 17, AF 12. These officials weighed the relevant facts and expressed their opinions that the existing banks would not be seriously affected, adversely affected, threatened or endangered. Typical of their comments was that of Mr. Polking, the hearing panel member who had voted in favor of the application:

> From the evidence presented at the hearing, it is my opinion that the present and future banking market in Fairbanks will support the entry of applicant's branch and that the solvency and profitable operation of the Fairbanks banks will not be threatened by approval of this application.

JA 135, AF 80. The repeated expressions of the Comptroller's staff of the expected compatibility of this branch and the existing banking facilities provide strong support for the conclusion that approval of the application would not, at the very least, be detrimental to the existing Fairbanks-based banks.

Finally, we turn to Mr. Robertson's contentions concerning the desirability of "balance" in the banking structure of the state. The Bank Examiner's Investigation Report succinctly framed the critical question:

> The question appears to be whether or not Alaska wants branch banking. If they want branch banking, it should be permitted on a statewide basis and

the letters of protest have little merit. If they want unit banking, the letters of protest have some merit . . . . JA 145, AF 69. There is little question from this record that Alaska wants branching. The Alaska Banking Code permits it, both state and national branches have been authorized and despite Mr. Robertson's opinions concerning "balance" he stated at the hearing that "I am in favor of expansion by either state or national banks where it is justified. . . . Our position on expansion is that where expansion is justified by economic conditions, by population, and so on, we encourage it." Tr. 64.

Mr. Selby's letter of October 30, 1970 specifically addresses this issue, and directly contradicts the "balanced" banking system views of Mr. Robertson:

> Alaska is an ever-expanding state with dynamic possibilities, and population growth, particularly in the Anchorage area, is assured. It will become increasingly important for all of the Alaska banks to establish branching lines to their customers as this growth continues. . . .

> Very little consideration can be given to the arguments presented at the hearings here in Portland relative to giving the smaller unit banks priorities on branch locations. *If the larger branch systems are stifled in their branch expansion, the viability of the banking structure in Alaska is damaged,* and customers of those banks suffer the consequences.

> Since paying a personal visit to Alaska, I have become more fully convinced of the soundness of the arguments presented by The First National Bank of Anchorage in defense of its application to enter Fairbanks and to establish branches at other locations to compete with the well-defined branch system of the National Bank of Alaska.

AF 12–13 (emphasis added).

It is apparent from the foregoing that Mr. Robertson and the Comptroller's office differ· in their interpretation of what constitutes a "sound banking system" in Alaska. We find, however, that the interpretation expressed by the Comptroller's office more nearly comports with the legislative intent expressed in Section 36(c) and the Alaska statute. Furthermore, we find substantial evidence in this record to support the conclusion that approval of this branch will not be "detrimental to a sound banking system" in any sense other than Mr. Robertson's alleged pre-emption of expansion opportunities in one of "those areas showing only 'future promise.'" Yet we have already stated our belief that in this specific respect Mr. Robertson's view of the "balance" necessary for the soundness of Alaska's banking system does not comport with the competitive equality mandated by Section 36(c) of the National Bank Act. Accordingly, we find substantial evidence that in approving this application the Comptroller did comply with Section 36(c) and the "sound banking system" standard of the Alaska Banking Code, and that the District Court's summary judgment in favor of the Comptroller on this point was properly granted.

*2. The "deceptively similar" name criterion.*

Appellant argues, and we believe properly so, that a branch of FNB Anchorage in Fairbanks could pose a serious problem under the "deceptively similar" name criterion; it could be seriously misleading for FNB Anchorage to open a new "First National· Bank" branch in a city which has known FNB Fairbanks as the only "First National" for more than 65 years. However, we believe it is perfectly apparent from the record that the Comptroller clearly recognized this problem at several stages of the proceedings and explicitly conditioned his approval of the application on the use of some distinctive name for FNB Anchorage's operations in Fairbanks.[22]

22. *See, e. g.,* AF 1–2, 5, 14, 18, 24, 75.

Appellant makes much of the fact that the initial letter of approval of the application, dated November 10, 1970, was not qualified in this manner. We find the Comptroller's letter of December 1, 1970 self-explanatory:

A review of our file indicates that our letter dated November 10, 1970, which approved the captioned application, made no express reference to the name by which this branch office will be designated.

Inasmuch as a bank with the words "First National Bank" in its title presently maintains banking operations in Fairbanks, we will require that the instant branch receive a distinctive designation which will eliminate possible confusion arising from name similarity. At your earliest convenience, please submit for the approval of this Office, a suggested branch name which will accomplish this purpose.

AF 5. On December 23, 1970, the Comptroller approved the designation "Interior City Branch" for use in "advertisements and other public representations concerning this banking office." AF 1. We do not believe this belated correction of what was so clearly an administrative oversight vitiates in any degree the conclusion that the Comptroller's approval was conditioned on the use of a distinctive name.[23] Accordingly, we believe that the record supports

the District Court's finding that "the Comptroller considered himself bound by, and did follow, the 'deceptive name' restriction in the Alaska statute. His determination that the use of a distinctive designation would satisfy that restriction is not improper or an abuse of discretion." JA 88.

## III. APPELLANT'S PROCEDURAL CONTENTIONS

FNB Fairbanks argues as another ground for reversal that basic concepts of administrative due process were violated in the Comptroller's conduct and use of the public hearing. The argument is made in two separate allegations of error: (1) that the failure to force testimony from and to permit cross-examination of FNB Anchorage's President "made a mockery of the public hearing," and (2) that in view of the refusal of FNB Anchorage's President to testify at the hearing the Comptroller accorded too much weight to the documentary evidence submitted by applicant in evaluating its merits against the volume of testimony presented by the protestants. It is, however, clear that these two allegations are both founded on the same underlying assertion—that the protestants were improperly denied an opportunity to confront applicants' President through cross-examination and thereby "probe the veracity of the statements contained in" the application.[24]

23. FNB Fairbanks further alleges in an affidavit by its President in support of its motion for a preliminary injunction in the District Court, as evidence of a lack of good faith in fulfilling this requirement, that FNB Anchorage has already commenced advertising that is deceptive. We find this a strange complaint. The advertisement indicates only that FNB Anchorage has a branch in Fairbanks. If one were to arrive in Fairbanks and look for the "First National Bank" there, since the Comptroller has required FNB Anchorage to prominently represent its local branch as "Interior City Branch," it is quite likely that the stranger would end up in the "First National Bank of Fairbanks" offices. Only one who knew in advance that the "Interior City Branch" he found in Fair-

banks was really the FNB Anchorage branch would be able to easily find the right bank if he were responding to the advertisement. The complained of advertisement, and its "deceptiveness," would thus seem to inure to the benefit of the plaintiff, a situation that hardly "adversely affects," "irreparably harms," or otherwise provides plaintiff a basis for complaint. Moreover, if FNB Anchorage indulges in deceptive advertising the complaint should be addressed to the Comptroller in the first instance.

24. We note initially that these procedural complaints were first raised in the District Court. Neither appellant nor any of the other protestants present at the hearing raised any objection to the Regional Comptroller's memorandum of pro-

We believe the appellant has misconstrued the purpose and function of the public hearing in branch application proceedings in the office of the Comptroller and that this procedural complaint derives from that misunderstanding. To begin, the Comptroller at the time of this application was not required to hold any hearing on branch applications.[25] When such hearings are held, the proceedings are not intended to be adversary, trial-type adjudicative hearings, but rather the hearing panel "is simply an investigatory or fact-gathering organ, not having any fact-finding function." First-Citizens Bank and Trust Company v. Camp, 409 F.2d 1086, 1090 (4th Cir. 1969). In this case, the hearing was granted in response to the protestants' request that they be given "a full opportunity to elaborate upon the reasons for their opposition." JA 107, AF 354. The critical feature of such a "fact-gathering" procedure, in order to provide the protestants with their opportunity to formulate a reasoned opposition, is to enable them to "know and meet opposing evidence with explanation or rebuttal evidence." First-Citizens, su-

pra, 409 F.2d at 1090. Neither oral testimony nor cross-examination of applicant's President is necessary for accomplishing this. By making all documents concerning the application (excepting only those considered confidential because of their proprietary nature) available in a public file, then introducing the contents of that file into evidence at the hearing, protestants were provided both the knowledge of applicant's evidence and the opportunity to explain or rebut that evidence with either documentary or testimonial evidence of their own.[26] We do not find that anything more was required.

As for the contention that too much weight was accorded the applicant's evidence, we fail to see how appellant can possibly protest the relative weights assigned to the evidence in view of the fact that both the hearing panel and the Comptroller in his initial action found in favor of the protestants. The Comptroller's subsequent approval of the application upon reconsideration appears largely based on the analysis and recommendations provided by Mr. Selby fol-

cedures to be followed, or to the conduct of the hearing itself. In another case in which procedural objections to a Comptroller's hearing on branch applications were raised for the first time in the trial court, the Fourth Circuit stated:

[Plaintiff's] right to raise at the judicial level procedural objections not advanced before the administrative agency is suspect, because, ordinarily, a litigant is not entitled to remain mute and await the outcome of an agency's decision and, if it is unfavorable, attack it on the ground of asserted procedural defects not called to the agency's attention when, if in fact they were defects, they would have been correctable at the administrative level. [citations omitted]

First-Citizens Bank and Trust Company v. Camp, 409 F.2d 1086, 1088–1089 (4th Cir. 1969). Appellant's right to raise these objections here is even more highly suspect since the initial outcome of the hearing was *favorable* to appellant's position—not only did the hearing panel recommend disapproval of the application, but the Comptroller initially concurred with that recommendation. To delay

raising procedural complaints about the hearing until after the Comptroller's unfavorable decision on reconsideration heightens the objection that the complaint is not well-founded.

25. *See* cases collected in note 2, *supra*; K. Davis, Administrative Law Treatise §§ 4.04, 4.16, 7.01, pp. 185, 216–17, 304–305 (1970 Supp.). Under his revised regulations, see notes 2 & 3, *supra*, and 12 C.F.R. §§ 5.1–.14 (1972), the Comptroller has declared that a hearing will be held upon request from "any interested person." With the exception of this change in policy concerning entitlement to a hearing, the new regulations do not appear to us to mark any significant departure from the practices or procedures followed in the hearing on this application.

26. In fact, the protestants were permitted to submit documentary evidence without a sponsoring witness subject to cross-examination in precisely the same manner (though, to be sure, not to the same extent) as FNB Anchorage submitted, and rested upon, their application with its supporting documents. Tr. 46–49.

lowing his personal visit to Alaska in October 1970. Thus that approval cannot be understood as having been based on an improper weighting of applicant's evidence at the March 1970 hearing. We must also recognize that the Comptroller's office brings wide knowledge and expertise in banking to bear on decisions such as when and where to approve a bank charter or branch bank. They have been entrusted with power in this area for many years.

We must, then, conclude that on both the procedural and substantive grounds raised by FNB Fairbanks, there is substantial evidence in the administrative record to support the summary judgment granted by the District Court in favor of the Comptroller and that the record reflects that the approval of the application by the Comptroller complied with both federal and state law. That judgment is accordingly

Affirmed.