C. W. SMITH, Jerry Black, James C. Meade, Jack Schwab, William C. Brown, Don W. Fitzgerald, Paul Hudiburg and Jon Conrad, organizers of First Hefner Bank, a state chartered banking institution, Plaintiffs,

v.

James E. SMITH, Comptroller of the Currency of the United States of America, Defendant.

No. CIV–76–0525–E.

United States District Court, W. D. Oklahoma.

May 20, 1977.

Jerry R. Nichols and Thomas P. Nally of Kothe, Nichols & Wolfe, Inc., Tulsa, Okl., and Robert H. Mitchell, Oklahoma City, Okl., for plaintiffs.

John E. Green, Acting U. S. Atty., and William S. Price, Asst. U. S. Atty., Oklahoma City, Okl., and Marilyn D. Britwar and Dorothy Kulig, Attys., Comptroller of the Currency, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

EUBANKS, District Judge.

■ Action arising out of the approval of a national bank application, plaintiffs seeking injunctive and declaratory relief. The matter is now before the court on countermotions for summary judgment.[1]

*Scope of Review*

■ The scope of judicial review of a determination of the Comptroller is whether the action taken was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The issue is one which is appropriately presented for summary disposition. *Bank of Commerce of Laredo v. City National Bank of Laredo*, 484 F.2d 284, 287 (5th Cir. 1973).

*Whether there is a rational factual basis for the action taken*

Plaintiffs challenge only the finding that the service area is able to sustain and desires to sustain[2] a new competitive entry (and not the finding that the proposed bank would be able to compete[3]).

The following is a summary of the pertinent data in the record.

The population of the northwest sector of Oklahoma City—and including the "proposed"[4] bank's primary service area—has grown dramatically in the last decade and a half, from approximately 7,000 to approximately 25,000. Personal incomes in the service's residential area exceed in the aggregate $100 million; 70% of the households have annual incomes of more than $11,000. Residences are predominantly single-family, ranging in value from $20,000 to $100,000.[5]

The service area is also well-endowed in terms of commercial enterprises. Both Baptist and Deaconess Hospitals are located there, employing (respectively) 1,500 and 570 persons. All tolled, there are some 1,500 establishments within two miles of the bank location, employing about 17,000 people. The bank is adjacent to a shopping center which has twelve stores and parking for 750 cars.

Continued growth is indicated in that there are still undeveloped tracts suited for residential or for commercial use.

The bank in the primary service area (Founders), and those along its periphery or

1. Defendant's alternative motion for judgment on the pleadings on the ground plaintiffs lack standing is denied. It is true that the existence of their banking facility is still speculative; however, their application has been approved by the state board and that approval has been affirmed by the court of banking review. (The Supreme Court of Oklahoma has not yet acted on a pending application for certiorari.) It cannot be said that recognition of their interest can only be premised on "unadorned" speculation; on the contrary, their interest is bottomed in an as yet valid and viable state charter.

2. Overbanking is one thrust of the allegations of the amended complaint. The brief stresses want of community support for a bank at the given location.

3. The organizers proposed a capital structure of $1,500,000—7½ times the statutory minimum. The organizers are persons of good standing in the business community. Whatever self-serving motivation may have attended the organizational effort appears to have been impeded by the lease adjustment.

4. See n. 10, *infra.*

5. In the Administrative Record (hereinafter A.R.), three "sectors" are identified: a neighborhood of homes in the $20,000–$25,000 range; another of homes from $25,000–$40,000; and a third with $40,000–$60,000 homes including however some valued between $70,000–$100,000. At 266.

adjacent to it, have experienced sound growth, Founders from deposits of $2 million to deposits of $26 million in ten years. None of the four nearest banks has deposits of less than $26 million. A.R. at 226.

■ In light of the recent history of the area and its potential for increased affluence, and in light of the fact that there is only one bank now in the primary service area and it and peripheral banks are sound, the court is of the opinion plaintiffs have failed to establish that the Comptroller's determination (that this bank's entry into the community would improve banking services without impacting adversely on existing facilities) was without rational support. On the basis of this record, that determination cannot be said to have been arbitrary, capricious, or an abuse of discretion.[6]

### Procedural Due Process

Plaintiffs do not contend they were denied the opportunity to be heard in opposition to this application. They do contend they were denied the opportunity to be heard in effective opposition because they were unaware of the existence of (much less the contents of) applicants' market feasibility study until the day of the hearing.

■ The court concludes plaintiffs were not denied the opportunity to be heard effectively. The feasibility study was a matter of public record (in the regional office) at least one month[7] before the hearing. The fact that aspirants would not file a bald application, but rather one attended by supporting data, and especially a feasibility study, does not appear to be cause for a claim of surprise.[8] More significantly, however, there was no element of finality to this hearing; the record remained open for supplementation.[9] See, e. g., *First National Bank of Fairbanks v. Camp*, 151 U.S.App. D.C. 1, 465 F.2d 586 (1972), cert. denied, 409 U.S. 1124, 93 S.Ct. 936, 35 L.Ed.2d 255 (1973).

### Negative Environmental Impact Statement (EIS)

■ While there was data indicating that traffic on the main arteries is heavy and that this intersection is dangerous, the bank's location upon property zoned for business use, in a pre-existing commercial building situated next to a pre-existing

---

6. It is for the Comptroller, and not this court, to weigh and resolve differences of opinion among field examiners/investigators as to, e. g., the justifiability of this bank's location as against the proposed state-chartered bank's. See *First National Bank of Fayetteville v. Smith*, 508 F.2d 1371, 1379 (8th Cir. 1974), cert. denied, 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975).

It is true, as plaintiffs argue, that there is evidence in the record that neither community need nor convenience will be served by this bank. But there was also evidence before the Comptroller to the contrary. See, e. g., A.R. at 24, 98–100. Arguably, a conclusion that the community would not be well-served would have been sustainable. But that is not the test; the test is whether there exists a rational factual basis for the determination that was reached, and in this instance there does. *Sterling National Bank of Davie v. Camp*, 431 F.2d 514 (5th Cir. 1970), cert. denied, 401 U.S. 925, 91 S.Ct. 879, 27 L.Ed.2d 829 (1971); *Village Bank v. Smith*, 388 F.Supp. 1253 (W.D.Okl.1975).

7. Indications are the study was submitted for the file on April 18, 1975 (A.R. at 384); the hearing was held June 17, 1975 (Transcript, hereinafter Tr.).

8. The study was not a hearing exhibit. Applicants' expert (Evans) testified generally as to findings. Tr. at 10–15. The court notes that at that hearing counsel for six protestants was prepared to and did call as a witness a feasibility analyst, offering his testimony in counter to applicants'. Tr. at 21–29. Both studies are included in the record. A.R. at 115–178, 179–285.

9. In their "Statements of Rebuttal" (A.R. at 78–86) plaintiffs, significantly, did not challenge the feasibility study. Their own, as would be expected, reaches the same result, except for the relative value of locations of Northwest Expressway-N.W. 63rd or Northwest Highway-MacArthur Boulevard. It would be an anomaly indeed were this court to reverse a determination of the Comptroller on the ground that one group of protestants had not availed themselves of data on public file which they would have not materially challenged in any event. (As a postscript, it is noted that plaintiffs' own market survey is apparently not a part of this court file, but is located therein accompanied by letter from plaintiffs' counsel addressed to another judge of this court.)

shopping center, was considered by the Comptroller, it is claimed, and deemed to militate against the necessity for preparation of an EIS. The Comptroller has finally prepared and filed a negative EIS. It is sufficient to "relate back" to the record and his determination.

By so concluding, the court does not condone singularly belated preparation of (negative) environmental impact studies. Judge H. Dale Cook's opinion on this subject is persuasive:

> "The Comptroller has an affirmative duty to develop a reviewable environmental record. If he determines that an EIS is not required, he should issue [IN THE RECORD IN THE FIRST INSTANCE] a negative declaration statement giving his reasons for that determination. Such a statement ensures that the Comptroller has given adequate consideration to the problem and provides a focal point for review of his determination by the District Court.

> \*    \*    \*    \*    \*    \*

> "The possibility that the preparation of a specific statement may not alter the Comptroller's ultimate decision does not relieve him from the responsibility of complying with the requirements of Federal law." *Harwood v. Bloom*, No. 76–C–347–C (N.D.Okla., filed March 22, 1977). (Bracketed emphasis supplied.)

*"Ex Post Facto" Review*

The court does not, by all the foregoing, place any stamp of approval on the issuance of a final charter while this lawsuit was pending. Nevertheless, whatever the impropriety if any of thrusting this court into the position of having to undertake "ex post facto" review [10]—it does not vitiate the court's conclusion that, in approving this bank application, in March of 1976, the Comptroller did not abuse his discretion nor did he act arbitrarily, capriciously or contrary to law.

Accordingly,

IT IS ORDERED that plaintiffs' motion for summary judgment be and the same hereby is denied.

IT IS FURTHER ORDERED AND ADJUDGED that defendant's motion for summary judgment be and the same hereby is granted.

Other pending motions are thereby deemed moot.

---

10. This lawsuit was filed June 25, 1976. The Comptroller issued final authorization to open February 7, 1977. The Lakeshore National Bank has been open for business since February 10, 1977. Plaintiffs did not make application for a hearing for preliminary injunction until February 14, 1977.

As of April 12, 1977, the bank had 757 demand deposit accounts, 375 savings accounts and sixteen CDs.