409 F.2d 1086
 FIRST-CITIZENS BANK AND TRUST COMPANY, Appellant,
v.
William B. CAMP, Comptroller of the Currency of the United States, Defendant, First Union National Bank of North Carolina, Intervenor, Appellees.
FIRST-CITIZENS BANK AND TRUST COMPANY, Appellant,
v.
William B. CAMP, Comptroller of the Currency of the United States, Defendant, and North Carolina National Bank, Intervenor, Appellees.
 No. 12552.
 No. 12553.
 United States Court of Appeals Fourth Circuit.
 Argued December 3, 1968.
 Decided April 3, 1969.
 
 John R. Jordan, Jr., Raleigh, N. C. (Jordan, Morris & Hoke, Raleigh, N. C., on brief), for appellant.
 Walter H. Fleischer, Atty., Department of Justice (Edwin L. Weisl, Jr., Asst. Atty. Gen., and Alan S. Rosenthal, Atty., Department of Justice, and Robert H. Cowen, U. S. Atty., on brief), for appellee William B. Camp.
 Hugh Cannon, Raleigh, N. C. (Sanford, Cannon, Adams & McCullough, Raleigh, N. C., on brief), for appellee First Union Nat. Bank of North Carolina.
 Charles T. Hagan, Jr., Greensboro, N. C. (Robert G. Baynes and Adams, Kleemeier, Hagan & Hannah, Greensboro, N. C., and A. L. Purrington, Jr., and Purrington, Joslin, Culbertson & Sedberry, Raleigh, N. C., on brief), for appellee North Carolina Nat. Bank.
 Before BOREMAN, WINTER and BUTZNER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Plaintiff, First-Citizens Bank and Trust Company ("First-Citizens"), sued to restrain the opening of branch banks by First Union National Bank of North Carolina ("FUNB") and North Carolina National Bank ("NCNB") in the North Hills Shopping Center, Raleigh, North Carolina. The suits were against the Comptroller of the Currency, who approved the establishment of the branches, and FUNB and NCNB intervened.
 
 
 2
 When the consolidated cases first came before the district court on the merits, it, conceiving that the intervening decision in First Nat. Bank of Logan, Utah v. Walker Bank & Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966), required the Comptroller to follow the North Carolina statutes, particularly N. C.Gen.Stat. § 53-62(b), in passing on branch applications,[1] remanded the case to the Comptroller for further hearings and findings in regard to the criteria established by state law. The Comptroller conducted further hearings, in which First-Citizens participated and made further findings, reaffirming his original determination to permit the branches to be established. The district court then considered the matter, on cross-motions for summary judgment, in the light of the Comptroller's redetermination. Judgment was granted for the Comptroller and the intervenors. We affirm.
 
 
 3
 On appeal, plaintiff makes three major contentions. First, it is claimed that plaintiff was not afforded a hearing on the crucial issue in the case — namely, that two new branches should be approved simultaneously. Second, it is asserted that the Comptroller and the district court improperly applied certain state standards for the approval of branches which were obligatory upon them. Third, it is argued that, under the proper standard of review (an issue itself in dispute) the approvals of the Comptroller cannot be permitted to stand. We deal with these issues, and the facts upon which they arise, seriatim.
 
 
 4
 — I —
 
 
 5
 First-Citizens is a state chartered bank, which operates a branch (opened in November, 1964, in a trailer) within the North Hills Shopping Center. Wachovia Bank & Trust Company ("Wachovia") also operates a branch in the center. When FUNB, on October 16, 1964, filed an application with the Comptroller to establish a branch in the same shopping center, First-Citizens filed a notice of protest with the Comptroller, together with a request for certain information and a request for a hearing. A conference was arranged but not held, and First-Citizens initiated litigation in the district court on January 14, 1965.
 
 
 6
 While the law suit was pending and following our decision in First National Bank of Smithfield, North Carolina v. Saxon, 352 F.2d 267 (4 Cir. 1965), the Regional Administrator of National Banks invited FUNB and other protestants to present evidence in the matter in Richmond. This was done on April 13, 1966.
 
 
 7
 In the meantime, NCNB, on March 17, 1966, filed an application for authority to open a branch in the North Hills Shopping Center, and First-Citizens filed a protest and request for information and hearing with regard thereto. A hearing was held on May 2, 3, 1966, in Richmond before the Regional Administrator, at which NCNB, First-Citizens and another protestant presented evidence. On June 6, 1966, First-Citizens filed a second suit in the district court seeking declaratory and injunctive relief with regard to the NCNB application, and, on September 29, 1966, the Comptroller approved the simultaneous opening of both branches.
 
 
 8
 The Richmond hearings were conducted separately on each application. The proceedings were not consolidated as such, although the Comptroller granted both approvals in a single opinion which discussed both applications.
 
 
 9
 When the district court remanded the proceedings to the Comptroller, the reconvened hearing on the FUNB application was held on April 10-11, 1967, and on the NCNB application on April 12-13-14-27 and 28, and May 17-18-19, 1967. Again, the proceedings were conducted separately on each application and, again, in an opinion dated November 28, 1967, the Comptroller combined the applications and granted his approval as to both.
 
 
 10
 First-Citizens disavows any claim that the manner in which the Comptroller conducted the original and reconvened hearings denied it due process of law. Rather, it complains that the hearings were not "fair," essentially because the Comptroller conducted no hearing on the simultaneous opening of the two branches and, secondarily, because the personnel comprising the hearing panel shifted from session to session.
 
 
 11
 At the outset, we note that at the administrative stage, First-Citizens lodged no objection to the successive scheduling of hearings on the two applications, nor the composition of the hearing panel. Its right to raise at the judicial level procedural objections not advanced before the administrative agency is suspect, because, ordinarily, a litigant is not entitled to remain mute and await the outcome of an agency's decision and, if it is unfavorable, attack it on the ground of asserted procedural defects not called to the agency's attention when, if in fact they were defects, they would have been correctible at the administrative level. United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952); Brotherhood of R. Trainmen v. Chicago, Milw., St. P. & P. R. Co., 127 U.S.App.D.C. 58, 380 F.2d 605, cert. den., 389 U.S. 928, 88 S.Ct. 289, 19 L.Ed.2d 279 (1967); Bower v. Eastern Airlines, 214 F.2d 623 (3 Cir.), cert. den., 348 U.S. 871, 75 S.Ct. 107, 99 L.Ed. 685 (1954); Marquette Cement Mfg. Co. v. F. T. C., 147 F.2d 589 (7 Cir. 1945), aff'd. on other grounds, Federal Trade Commission v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); Red River Broadcasting Co. v. F. C. C., 69 App.D.C. 1, 98 F.2d 282, cert. den., 305 U.S. 625, 59 S.Ct. 86, 83 L.Ed. 400 (1938). Moreover, it would seem from United States v. Pierce Auto Lines, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946), that the failure to consolidate the hearings on the two applications was not error.
 
 
 12
 A more basic answer with regard to the Comptroller's failure formally to consolidate the two applications is that, as a practical matter, they were considered together, so that it cannot be said that First-Citizens suffered prejudice by what occurred. First-Citizens main evidence in opposition to the grant of the two applications, an economic and marketing research analysis of the need for and economic feasibility of a new branch bank in the North Hills Shopping Center, presented in both proceedings, discussed the feasibility of two additional banking offices and concluded that "sufficient business would exist at a considerably later date for one additional office (but not two)." That the Comptroller treated the two applications as interrelated is manifest from his opinions. In his first opinion, dated September 29, 1966, in which he concluded to grant both applications, the Comptroller noted the filing of applications by FUNB and NCNB and stated, "[e]ven though each application must stand on its own merits, they are considered together in this opinion because the relevant economic data and banking factors are nearly identical and because the action taken on each application was a factor in the consideration of the other." (Emphasis supplied.) In his second opinion, dated November 28, 1967, after remand by the district court, the Comptroller reiterated the same approach.[2] Thus, contrary to First-Citizens' contention, in proof and in decision, the issue of the simultaneous opening of the two new branches was raised and decided.
 
 
 13
 Assuming that First-Citizens may be heard on that issue at this time, we do not find merit in the contention that the "fairness" of the hearings was destroyed by changing personnel in the hearing panel. In First National Bank of Smithfield we held that in considering an application for a branch bank the Comptroller is not bound to the requirements of § 7 of the Administrative Procedure Act, 5 U.S.C.A. § 556.[3] Thus, the argument misconceives the function of the panel. It does not constitute a hearing officer or trial examiner such as play an important part in the administrative process of other agencies amenable to the Act. It is simply an investigatory or fact-gathering organ, not having any fact-finding function. The decision was made by the Comptroller who had initiated the practice of rendering a written opinion exposing the basis of his determination. Bloom, Hearing Procedures of the Office of the Comptroller of Currency, 31 Law and Contemp.Problems 723 (1966). Of course, even in a fact-gathering procedure, due regard should be had for a party to know and meet opposing evidence with explanation or rebuttal evidence. 1 Davis, Administrative Law Treatise, § 4.04 (1958 Ed. and 1965 Supp.); § 7.16, at p. 180 (1965 Supp.). But the record shows that First-Citizens was fully afforded this opportunity.
 
 
 14
 — II —
 
 
 15
 The authority of the Comptroller to permit the opening of a branch bank is contained in 12 U.S.C.A. § 36(c), the text of which is set forth in the margin.[4] North Carolina law would permit FUNB and NCNB, since they are both located in Raleigh, North Carolina, to establish a branch or teller window elsewhere in that city, if certain conditions are met, so that, pursuant to 12 U.S.C.A. § 36(c), it is also to the statute of North Carolina — N.C.Gen.Stat. § 53-62(b)[5] — to which we must turn to determine the conditions precedent to the opening of the branch. Essentially, they are two: (a) that the establishment of the branch "will meet the needs and promote the convenience of the community to be served by the bank" and (b) "that the probable volume of business and reasonable public demand in such community are sufficient to assure and maintain the solvency of said branch * * * and of the existing bank or banks in said community."
 
 
 16
 The Comptroller urges that in resorting to state law he is bound only by state capitalization and state location requirements, but he is not bound by North Carolina's "need and convenience" and "solvency of the branch" criteria. Support for this view is claimed in our previous decision in First National Bank of Smithfield. We reject the contention. To the extent that First National Bank of Smithfield supports the Comptroller's argument, its authority has been vitiated by First Nat. Bank of Logan, Utah v. Walker Bank & Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). Certiorari was granted in that case because of "a conflict between [the decisions there reviewed] * * * and the decision in First National Bank of Smithfield * * *" with a holding on the merits, that the views contrary to First National Bank of Smithfield should prevail and language in the opinion making the path we should follow here apparent.[6] We, therefore, hold that the Comptroller was bound by North Carolina's "need and convenience" and "solvency of the branch" criteria.
 
 
 17
 In considering whether the Comptroller properly construed and applied North Carolina's "need and convenience" and "solvency of the branch" criteria, we note at the outset the absence of any definitive State interpretation of these nebulous concepts. The Comptroller's construction of the North Carolina "need and convenience" criterion is to be inferred from his findings on this issue, which he concluded supported his ultimate finding that the needs and convenience of the community would be met by authorization for the opening of the two branches.[7] Similarly, in regard to the ultimate finding on solvency, the Comptroller set forth what he considered the pertinent considerations.[8]
 
 
 18
 First-Citizens' contentions, summarized, with regard to North Carolina's "need and convenience" criterion relate to four aspects. First, it is said that the Comptroller incorrectly applied the North Carolina law by failing to make a definitive finding of the proper service area to be considered. First-Citizens contends that the area should only be that from which will be drawn 70-75% of accounts, and it claims that on the basis of its experience and that of Wachovia, proven before the Comptroller, the proper service area under the test it advocates is approximately that encompassed by census tract #26 which is the area in close geographical proximity to the North Hills Shopping Center. Secondly, First-Citizens complains of the Comptroller's lack of specific finding as to the deposit or loan potential for a properly defined service area, and it claims that it alone offered such proof to show that the potential was not great enough to support additional branch banks. Thirdly, First-Citizens contends that the Comptroller had before him no proof of a present need for any additional bank and, indeed, had scientific proof, based on random samples, to show that an additional bank was not needed. Lastly, First-Citizens complains that the Comptroller failed to take into consideration the quality and quantity of existing bank services.
 
 
 19
 In assessing these contentions, we underscore that neither the North Carolina statute nor any decided cases provides any degree of specificity as to the factors, proof of which would show the presence or absence of "need and convenience" for a new branch bank. In many of First-Citizens' contentions on this issue, there is implicit the concept that the Comptroller must view a given locality as a static concept. This the Comptroller did not do. He viewed the area, particularly because of the rapid growth and expansion to the north, as a dynamic community and, not unreasonably, we believe, undertook to predict future needs and conveniences, as well as those existing at the time that the applications were before him.[9] In this we find no error. The grant of an application to open a branch bank is significant not only for today but also for tomorrow. Manifestly, it is proper to consider tomorrow in concluding what should be done today.
 
 
 20
 Nor do we find error in the Comptroller's failure to make definitive specific findings with regard to the service area, economic feasibility, public needs, and quality and quantity of existing service. From what he said, it is obvious that he considered the service area to be greater than that advocated by First-Citizens, ultimate economic feasibility of another bank or banks of sufficient future potential to warrant granting applications to open them and future public need sufficient to support them. The North Carolina law does not specify the extent to which, if at all, any one or more of the factors urged on us by First-Citizens is to be considered or the weight to be given thereto. Overall, we cannot say that the Comptroller's construction of the North Carolina law was unreasonable.
 
 
 21
 As to First-Citizens' "solvency of the branch" argument, again, there is a lack of definitive direction in the North Carolina statute.[10] The Comptroller manifestly considered the capitalization of the applicants, because he made a specific finding that each had capital in excess of North Carolina statutory requirements. He considered, also, the effect of competition on First-Citizens, because he found that the competition generated by the grant of the applications would not cause First-Citizens' assets to become insufficient to pay its liabilities to depositors and other creditors. He found that the "continued solvency of the existing financial institutions is not in doubt," and implicit in his findings in his second opinion on remand, and explicit in his first opinion, was the conclusion that all four banks [First-Citizens, Wachovia, FUNB and NCNB] "can survive and prosper without difficulty in this growing market area." Indeed, he found, specifically, that First-Citizens' deposits at its North Hills branch could be expected to increase by the addition of either or both of the new branches for which permission was sought.
 
 
 22
 We cannot say that the Comptroller unreasonably construed the North Carolina statute, or that the North Carolina statute required consideration of any factor on which a specific finding was not made.
 
 
 23
 — III —
 
 
 24
 Any consideration of the correctness of the Comptroller's findings and ultimate conclusion to grant the applications must begin with a statement of the scope of judicial review in a case such as this. First-Citizens argues that it was entitled to a judicial determination de novo, or, at least, that there should be an independent full-scale reexamination and weighing of the evidence. Alternatively, First-Citizens appears to accept the "substantial evidence" rule applied by the district court. FUNB and NCNB argue that the correctness of the district judge's conclusions should be measured by the "clearly erroneous" test. The Comptroller argues that in no event should he be subject to review on a standard as rigorous as the substantial evidence rule, and he suggests a lesser burden, whether it has been shown that his determination was arbitrary, capricious or beyond the bounds of governing statutes.
 
 
 25
 In First National Bank of Smithfield we effectively denied resort to a determination de novo, except in those instances in which the Comptroller failed to conduct an adversary hearing. Since we have concluded that First-Citizens was afforded the right to an adversary hearing and exercised it, there could not be a hearing de novo or an independent full-scale reexamination and weighing of the evidence. In First National Bank of Smithfield we suggested resort to the substantial evidence rule where an adversary hearing had been held and a record made subject to the qualification that where the decision of the Comptroller is dependent upon an exercise of discretion, the reviewing court cannot substitute its discretion for the Comptroller's, unless the Comptroller has abused, exceeded or arbitrarily applied his discretion. Since the decision in Walker Bank from which we have concluded that the Comptroller is bound by the North Carolina statute, and since the Comptroller has exercised his discretion to permit both branch banks, this exception to the general rule can have little application to the present case. We conclude that the scope of review should not be more rigorous than the substantial evidence rule. Cf. United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); American Trucking Assns. v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953); Webster Groves Trust Co. v. Saxton, 370 F.2d 381 (8 Cir. 1966); Bridgeport Federal Savings & Loan Assn. v. Federal Home Loan Bank Board, 199 F.Supp. 410 (E.D.Pa.1961), aff'd., 307 F.2d 580 (3 Cir. 1962), cert. den., 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499 (1963).
 
 
 26
 We do not find it necessary to put a more precise label on the scope of review to be afforded in this case because, under the substantial evidence rule, and a fortiori under any less rigorous standard, we think that the findings of the Comptroller and his conclusions to grant both applications are fully supported. As we have shown, we do not think that the Comptroller unreasonably or impermissibly construed the North Carolina statute by which his action was bound. While it is true that the proof of First-Citizens was presented in more systematic form than that of the applicants, the detailed findings of the Comptroller were based upon evidence that was before him, and these findings, as we have previously indicated, mount up to adequate support for his conclusion to grant both applications. It is no proper ground for objection that the Comptroller found certain disputed evidence more persuasive than that which controverted it. We concur in the ultimate conclusion of the district judge "that the Comptroller's findings and conclusions are substantially and rationally supported, and are neither unfair, arbitrary, nor capricious." First Citizens Bank & Trust Company v. Camp, 281 F.Supp. 786, 793 (E.D.N.C. 1968).
 
 
 27
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Although the Comptroller urged, at that stage of the proceedings, that reference to state law as to "needs and convenience" factors established by N.C.Gen.Stat. § 53-62 (1967 Supp.) was not required under our decision in First National Bank of Smithfield, North Carolina v. Saxon, 352 F.2d 267 (4 Cir. 1965), and, alternatively, that the Comptroller had made adequate findings in regard to the criteria established by the North Carolina law, he did not appeal or apply for permission to take an interlocutory appeal
 
 
 [2]
 "Although each branch application is processed separately and must stand on its own merits, the applications of First Union National Bank and North Carolina National Bank for branches in North Hills Shopping Center are considered together in the opinion because the relevant economic data and banking factors are nearly identicaland because a decision to approve or not to approve one application might have a direct bearing on the consideration of the other." (Emphasis supplied.)
 
 
 [3]
 SinceSmithfield, similar conclusions have been reached in Webster Groves Trust Co. v. Saxon, 370 F.2d 381 (8 Cir. 1966); Citizens Bank of Hattiesburg v. Camp, 387 F.2d 375 (5 Cir. 1967), cert. den., 391 U.S. 904, 88 S.Ct. 1652, 20 L. Ed.2d 418 (1968); Warren Bank v. Saxon, 263 F.Supp. 34 (E.D.Mich.1966), aff'd, Warren Bank v. Camp, 396 F.2d 52 (6 Cir. 1968).
 
 
 [4]
 12 U.S.C.A. § 36(c):
 "(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. In any State in which State banks are permitted by statute law to maintain branches within county or greater limits, if no bank is located and doing business in the place where the proposed agency is to be located, any national banking association situated in such State may, with the approval of the Comptroller of the Currency, establish and operate, without regard to the capital requirements of this section, a seasonal agency in any resort community within the limits of the county in which the main office of such association is located, for the purpose of receiving and paying out deposits, issuing and cashing checks and drafts, and doing business incident thereto: Provided, That any permit issued under this sentence shall be revoked upon the opening of a State or national bank in such community. Except as provided in the immediately preceding sentence, no such association shall establish a branch outside of the city, town, or village in which it is situated unless it has a combined capital stock and surplus equal to the combined amount of capital stock and surplus, if any, required by the law of the State in which such association is situated for the establishment of such branches by State banks, or, if the law of such State requires only a minimum capital stock for the establishment of such branches by State banks, unless such association has not less than an equal amount of capital stock." (emphasis supplied.)
 
 
 [5]
 N.C.Gen.Stat. § 53-62(b):
 "Any bank doing business under this chapter may establish branches or teller's windows in the cities or towns in which they are located, or elsewhere, after having first obtained the written approval of the Commissioner of Banks, which approval may be given or withheld by the Commissioner of Banks, in his discretion. The Commissioner of Banks, in exercising such discretion, shall take into account, but not by way of limitation, such factors as the financial history and condition of the applicant bank, the adequacy of its capital structure, its future earnings prospects, and the general character of its management. Such approval shall not be given until he shall find (i) that the establishment of such branch or teller's window will meet the needs and promote the convenience of the community to be served by the bank, and (ii) that the probable volume of business and reasonable public demand in such community are sufficient to assure and maintain the solvency of said branch or teller's window and of the existing bank or banks in said community."
 
 
 [6]
 "It appears clear * * * that Congress intended to place national and state banks on a basis of `competitive equality' insofar as branch banking was concerned. * * * It is not for us to so construe the Acts as to frustrate this clear-cut purpose so forcefully expressed by both friend and foe of the legislation at time of its adoption. * * *
 "The Comptroller argues that Utah's statute `expressly authorizes' state banks to have branches in their home municipalities. He maintains that the restriction, in the subsequent paragraph of the statute limiting branching solely to the taking over of an existing bank, is not applicable to national banks. It is a strange argument that permits one to pick and choose what portion of the law binds him. Indeed, it would fly in the face of the legislative history not to hold that national branch banking is limited to those States the laws of which permit it, and even there `only to the extent that the State laws permit branch banking.' Utah clearly permits it `only to the extent' that the proposed branch takes over an existing bank.
 "The Comptroller also contends that the Act supersedes state law only as to `whether' and `where' branches may be located and not the `method' by which this is effected.
 "We believe that where a State allows branching only by taking over an existing bank, it expresses as much `whether' and `where' a branch may be located as does a prohibition or a limitation to the home office municipality." 385 U.S. 261-262, 87 S.Ct. 497.
 
 
 [7]
 "First, a large portion of the community surrounding North Hills Shopping Center is comprised of existing customers of both banks, who expect their bank to provide service in terms of convenience of location. First Union, the third largest bank in the state, has deposits exceeding $500,000 and over $1 million in loan volume originating in the North Hills area from over 500 existing area accounts. North Carolina National, the second largest bank in the state, has deposits of approximately $4.8 million and loan volume of over $3 million in the North Hills area. NCNB had 2446 deposit accounts in the area as of May 1967
 Second, the demonstrable growth of this northern section of Raleigh's suburbs indicates that the North Hills community can support and needs the same caliber and variety of banking services as those which service downtown Raleigh. All four banks, the protestants, First Citizens and Wachovia, and the applicants, First Union and North Carolina National, compete vigorously throughout the Raleigh downtown and metropolitan area and this competition provides better and more convenient banking services for the public. North Hills, as the focal point of a marked northern growth pattern out from the city, represents an ideal location for the extension of this same high performance bank service.
 The location of the shopping center on U. S. 1 and the U. S. 64 Raleigh by-pass and bordering two other major in-town arterials makes North Hills accessible to the major population of Raleigh and Wake County as well as to a wider geographical region surrounding the city. It is well-known that in the suburbs a bank's trading area may extend for several miles, crossing into different communities. A major thrust of population growth in Raleigh is north.
 A natural response to growth is expansion. The shopping center in North Hills was expanded in plans revised in 1965 to include a two level air conditioned mall with 530,000 square feet of space in one parcel, an 80,000 square foot center for convenience services in a second, and a five to six story office building with 80,000 square feet of space in a third parcel. Retail sales jumped from 4½ million in 1964 to 7 million in 1966. J. C. Penney's Department Store is expected to be the last major tenant to open with a target date of February 1968. When completed, the shopping center is expected to have 77 stores, parking for 4200 cars with up to 1500 employees. As of April 1967, 28 of the projected 55 stores in the central mall portion of the shopping center were open.
 In addition to the industrial and residential development described in the Comptroller's original opinion, there was testimony as to the size and stage of development of approximately seventeen different residential and apartment projects in the North Hills area. Homes range in price from $14,000 to $125,000 with lot sizes varying accordingly. Development tracts range in size from 900-1000 acres down to those developed tracts with only 20-30 acres. A full facility country club and 1000 homesites are scheduled for completion in early 1968. Waiting lists for new apartments in the North Hills area are indicative of the steady increase in population concentration and in the not-too-distant future, the area may encompass 35,000 to 50,000 people.
 Third, each of the applicant banks will bring new types of banking services to this area. First Union National Bank operates a charge plan which calls for frequent deposit trips by the participating merchants. North Carolina National Bank has a different credit card program with thirteen member firms in North Hills. North Carolina National Bank also offers non-passbook savings accounts and 5 percent bonus savings accounts.
 Fourth, the President of the Raleigh operations of First Citizens Bank and Trust Company testified that the presence of additional competition would not cause the assets of First Citizens to become insufficient to pay its liabilities to depositors and other creditors, and that as of April 1967, the entire Raleigh operation of First Citizens composed of nine branches was making a profit.
 Fifth, the addition of either or both of the two new banking offices applied for, on the basis of economic studies made by the Comptroller's office as to the general effect of the introduction of new branches, is likely to increase deposits at the existing North Hills branches of both the First Citizens Bank and Trust Company and the Wachovia Bank and Trust Company."
 
 
 [8]
 "Seventh, with regard to the North Carolina statutory capital requirements, both First Union National Bank and North Carolina National Bank have more than sufficient capital to meet the state statutory requirements. By virtue of Title 12, Section 36(c) and (d), state capital requirements are also incorporated into the National Bank Act, and every branch investigation report requires a determination to be made as to the sufficiency of the applicant bank's capital structure. First Union National Bank of North Carolina would require a minimum of $23,500,000 in capital to support its 103 approved branches including the North Hills branch. Total capital available to the applicant was #37,425,316 or $13,925,316 in excess of the state law requirements. There was no dispute over population figures, and they are accepted as set forth in the Applicant's Exhibit Y of the second hearing
 North Carolina National would require a minimum of $20,800,000 in capital to support its 78 approved or applied for branches including the North Hills branch. Total capital available was $51,708,570 or $30,908,570 in excess of that required. There was no dispute over population figures, and they are accepted as set forth in the Applicant's Exhibit 2-12 of the second hearing.
 In summary, the available evidence indicates that the applicants are correct in their judgment of the present and potential banking opportunities in North Hills. Both protestants, First Citizens and Wachovia appear well able to withstand the competitive impact of a new entry in this growing area of the city and the continued solvency of the existing financial institutions is not in doubt."
 
 
 [9]
 The importance of a properly defined service area can best be illustrated by the following: Under First-Citizens concept of the area, the proof First-Citizens offered showed that there were 3,100 persons per existing branch. The Comptroller considered a larger area, a two-mile radius from the branches, and concluded that there were more than 5,000 persons per existing branch, compared with an average of 3,774 per branch throughout the City of Raleigh
 
 
 [10]
 The lack of specificity can be pinpointed to use of the words "community" and "existing bank or banks in said community." Does "community" mean the area to be served by the branch for which approval is sought, or does it mean the entire City of Raleigh? Does "existing bank or banks, etc." refer to First-Citizens as a total banking institution or does it refer to First-Citizens' North Hills branch? The district judge, as to the former, was inclined to the view that "community" meant the entire City of Raleigh and, as to the latter, that "existing bank, etc." meant First-Citizens as an entire banking institution. Absent a definitive state construction of these terms, we do not think this construction impermissible or unreasonable