NORTH CAROLINA FORESTRY ASSOCIATION, Petitioner v. NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL RESOURCES, DIVISION OF WATER QUALITY, and the NORTH CAROLINA ENVIRONMENTAL MANAGEMENT COMMISSION and its NPDES COMMITTEE, Respondents, and THE SIERRA CLUB and DOGWOOD ALLIANCE, Respondent-Intervenors

No. COA01-1329

(Filed 19 November 2002)

**Environmental Law— stormwater discharges—general permit—exclusion of new or expanding wood chip mills—aggrieved party**

The N.C. Forestry Association (NCFA) is not an "aggrieved party" and thus lacks standing to bring a contested case proceeding for review of a final agency decision of the Environmental Management Commission that the Division of Water Quality acted

within its authority in excluding new or expanding wood chip mills from coverage under a general timber products industry NPDES permit for stormwater discharges because (1) NCFA is not entitled to a general permit under N.C.G.S. § 143-215.1(b)(3) and (b)(4), and (2) NCFA does not claim that it or any of its members has been denied a permit since the individualized permitting process went into effect.

Judge TYSON dissenting.

Appeal by petitioner from order entered 27 March 2001 by Judge Howard E. Manning, Jr. in Wake County Superior Court. Heard in the Court of Appeals 15 August 2002.

*Hunton & Williams, by Charles D. Case, Craig A. Bromby, Jeff F. Cherry, and Julie Beddingfield, for petitioner-appellant.*

*Attorney General Roy Cooper, by Assistant Attorney General Jill B. Hickey, for respondent-appellee Department of Environment and Natural Resources, Division of Water Quality, the Environmental Management Commission, and its NPDES Committee.*

*Southern Environmental Law Center, by Donnell Van Noppen, III, for respondent-intervenors-appellees The Sierra Club and Dogwood Alliance.*

THOMAS, Judge.

The North Carolina Forestry Association (NCFA), petitioner, appeals the trial court's order affirming in part and reversing in part a final agency decision of the North Carolina Environmental Management Commission (EMC).

The trial court upheld EMC's conclusion that the Department of Environment and Natural Resources, through the Division of Water Quality, acted within its authority in excluding new or expanding wood chip mills from coverage under a general timber products industry permit. The trial court also found EMC's decision to be timely, and a contrary Recommended Decision of an Administrative Law Judge not to be the final agency decision.

The trial court, however, did reverse the part of EMC's decision finding NCFA lacked standing to even bring the action. Respondents and respondent-intervenors cross-assign that reversal as error. For

the reasons herein, we agree with respondents and respondent-intervenors. NCFA is not an aggrieved party and, therefore, lacks standing.

NCFA is a private organization whose members are in forest management and timber products industries, including wood chip mills.

Respondents include: (1) the North Carolina Department of Environment and Natural Resources, Division of Water Quality (DWQ); (2) EMC, which adopts rules that the Department of Environment and Natural Resources is responsible for enforcing; and (3) the National Pollutant Discharge Elimination System Committee (NPDES Committee), a committee of EMC which hears appeals of DWQ's permitting decisions. Respondent-intervenors are The Sierra Club and Dogwood Alliance.

Under the Federal Water and Pollution Control Act, industrial facilities must obtain National Pollutant Discharge Elimination System Permits (NPDES permits) for stormwater discharges. The federal act authorizes individual states to administer the NPDES permit system. 33 U.S.C. § 1342 (2001). In North Carolina, DWQ issues NPDES permits. Permits may be "general," prescribing conditions to be applied to a group or category of discharges, or "individual," tailored to the particular discharge and location. N.C. Gen. Stat. § 143-215.1 (2001).

In 1992, DWQ issued a general NPDES permit, NCG040000. The permit was valid for a period of five years and encompassed some segments of the timber products industry, including wood chip mills. It specifically excluded the logging, wood preserving, and cabinet-making segments of the industry, which had to apply for individual permits.

The 1992 general permit expired in August 1997. DWQ then issued general permit NCG210000 in April 1998. In addition to the logging, wood preserving, and cabinet-making segments of the timber products industry, wood chip mills were excluded from general permit NCG210000. As part of this decision, DWQ allowed wood chip mills that had applied for and obtained coverage under general permit NCG040000 before it expired to remain covered. Only new or expanding wood chip mills were required to apply for individual permits.

On 1 June 1998, NCFA filed a Petition for a Contested Case Hearing seeking administrative review of the decision, claiming its members "who decide to locate and permit new chip mills in North Carolina will be subject to, among other things, burdensome applica-

tion procedures and additional monitoring and reporting requirements." The North Carolina Department of Environment and Natural Resources, and the Sierra Club and Dogwood Alliance, filed a joint motion to dismiss.

The Administrative Law Judge denied the motion to dismiss, with both NCFA and respondents moving for summary judgment. The Administrative Law Judge recommended that summary judgment be entered in favor of NCFA and concluded that DWQ lacked statutory authority to consider secondary water quality impacts of wood chip mills, such as sedimentation and erosion, when it decided to exclude them from general permit NCG210000. The order stated that the final agency decision "shall be rendered by the NPDES Committee of the Environmental Management Commission."

On 13 October 1999, a hearing was held before the NPDES Committee. It did not take new evidence after receiving the recommended decision from the Administrative Law Judge. The NPDES Committee held NCFA lacked standing to bring the action and therefore summary judgment should be granted in favor of respondents. Moreover, it ruled in the alternative that if NCFA did have standing, then DWQ "did not exceed its authority or jurisdiction, act erroneously, fail to act as required by law or rule, fail to use proper procedure, or act arbitrarily or capriciously in its decision to exclude wood chip mills from coverage under NPDES Stormwater General Permit No. NCG210000." NCFA then sought judicial review of the final agency decision.

The trial court's order includes the following: (1) NCFA is a "person aggrieved" and is therefore entitled to commence a contested case proceeding to challenge the decision not to renew a general stormwater permit to the wood chip mill industry; (2) the Director of the DWQ, acting under a delegation of authority from EMC, has the absolute power to issue or not to issue a general permit for any class of activities; and (3) EMC's final agency decision was timely. Accordingly, the trial court reversed that portion of EMC's decision dismissing NCFA's petition for a contested case hearing. It affirmed that portion of EMC's decision upholding DWQ's determination not to include wood chip mills in general stormwater permit NCG210000.

NCFA appeals, contending the trial court: (1) erred in finding the final agency decision to be timely; (2) applied the incorrect standard of review in determining respondent had "absolute power to issue or not issue a general permit" under N.C. Gen. Stat. § 143-215.1; (3)

failed to apply standard rules of statutory construction in determining DWQ's statutory authority under N.C. Gen. Stat. § 143-215.1; (4) failed to find the final agency decision was affected by errors of law; (5) failed to find the final agency decision was arbitrary and capricious and without substantial evidence; and (6) erred in not ruling on motions to correct and supplement the record.

Respondent and respondent-intervenors' sole cross-assignment of error is that the trial court erred in concluding NCFA is a "person aggrieved" under the North Carolina Administrative Procedure Act (NCAPA) and therefore has standing to commence a contested case proceeding.

On review of a trial court's order regarding a final agency decision, we examine for error by determining whether the trial court: (1) exercised the proper scope of review; and (2) correctly applied this scope of review. *Dillingham v. N.C. Dep't. of Human Res.*, 132 N.C. App. 704, 708, 513 S.E.2d 823, 826 (1999).

In the instant case, we proceed with *de novo* review of whether the NCAPA confers standing on NCFA, a question of law. *See id.* (after determining the actual nature of the contended error the appellate court then proceeds utilizing the proper standard of review). *De novo* review requires the court to "consider a question anew, as if not considered or decided by the agency previously" and to "make its own findings of fact and conclusions of law" rather than relying upon those made by the agency. *Jordan v. Civil Serv. Bd. of Charlotte*, 137 N.C. App. 575, 577, 528 S.E.2d 927, 929 (2000) (citation omitted).

The NCAPA provides that "[a]ny person aggrieved may commence a contested case hearing hereunder." N.C. Gen. Stat. § 150B-23(a) (2001). The contested case hearing provisions of the NCAPA apply to all agencies and all proceedings except those expressly exempted therefrom, and specifies the extent of each such exemption. N.C. Gen. Stat. § 150B-1 (2001); *see also Empire Power Co. v. N.C. Dept. of E.H.N.R.*, 337 N.C. 569, 447 S.E.2d 768, *reh'g denied*, 338 N.C. 314, 451 S.E.2d 634 (1994). The General Assembly has not expressly exempted DENR from a contested case hearing in administering the stormwater permitting process. Thus, NCFA is entitled to a contested case hearing if it is a "person aggrieved." *Empire*, 337 N.C. at 588, 447 S.E.2d at 779.

"Under the NCAPA, any 'person aggrieved' within the meaning of the organic statute is entitled to an administrative hearing to deter-

mine the person's rights, duties, or privileges." *Id.* "The organic statute . . . defines those rights, duties, or privileges, abrogation of which provides the grounds for an administrative hearing pursuant to the NCAPA." *Id.* at 583; 447 S.E.2d at 776-77.

Here, the organic statute is N.C. Gen. Stat. § 143-215.1. It authorizes EMC to issue permits in order to control sources of water pollution. Accordingly, NCFA is a "person aggrieved" if section 143-215.1 defines a right of NCFA's that has been abrogated.

Subsection (b) of N.C. Gen. Stat. § 143-215.1 gives EMC authority to issue general permits:

(3) General permits may be issued under rules adopted pursuant to Chapter 150B of the General Statutes. Such rules may provide that minor activities may occur under a general permit issued in accordance with conditions set out in such rules. All persons covered under general permits shall be subject to all enforcement procedures and remedies applicable under this Article.

(4) The Commission shall have the power:

. . .

(d) To designate certain classes of minor activities for which a general permit may be issued, after considering: 1. The environmental impact of the activities; 2. How often the activities are carried out; 3. The need for individual permit oversight; and 4. The need for public review and comment on individual permits.

N.C. Gen. Stat. § 143-215.1(b)(3) and (b)(4) (2001). Significantly, this statute does not require EMC to make general permits available. Availability of general permits depends on, *inter alia*, the "need for individual permit oversight" and the "need for public review and comment on individual permits." N.C. Gen. Stat. § 143-215.1(b)(4).

Further, North Carolina's regulations of water resources are modeled after the Federal Water Pollution Control Act. General permits under the federal act were created after the United States Environmental Protection Agency attempted to exempt entire classes of source points from the NPDES permit requirement because "the tremendous number of sources within the exempted categories would make the permit program unworkable." *NRDC v. Train*, 396 F.Supp. 1393, 1395 (D.D.C. 1975), *aff'd*, *NRDC v. Costle*, 568 F.2d 1369

(D.C. Cir. 1977). In *NRDC v. Train*, the Court held that the EPA had no authority to exempt entire classes of source points, but recognized that it could use "administrative devices, such as area [or general] permits, to make EPA's workload manageable." *Id.* at 1402. North Carolina received EPA authorization to issue general permits in 1991. *See* 1989 N.C. Sess. Laws ch. 453, § 1.

Review of N.C. Gen. Stat. § 143-215.1(b) and the history of general permits reveals their primary purpose is to alleviate EMC's administrative burden. Accordingly, the statute does not define a right to a general permit, "abrogation of which provides the grounds for an administrative hearing pursuant to the NCAPA." *Empire*, 337 N.C. 583, 447 S.E.2d at 776-77. Wood chip mills have no more right to general permitting than do the logging, wood preserving, and cabinet-making segments of the timber industry which had been earlier, and still remain, excluded.

Moreover, NCFA does not claim it or any of its members has been denied a permit as a result of the change in the permitting process. In essence, NCFA's claim for standing is that it prefers one type of permitting process over another to be utilized some time in the future. Section 143-215.1(e) allows contested case review to a *"permit applicant or permittee* who is dissatisfied with a decision of the Commission[.]" N.C. Gen. Stat. § 143-215.1(e) (2001) (emphasis added).

Accordingly, we hold NCFA is not a "person aggrieved" on two grounds, either of which is sufficient for dismissal. First, NCFA is not entitled to a general permit. Second, NCFA has not been denied a permit. In fact, when the trial court rendered its decision none of its members had even attempted to file an application for a permit since the individual permitting process went into effect. Thus, there is no abrogation of any right.

The Office of Administrative Hearings, therefore, did not have subject matter jurisdiction. The order of the trial court reversing EMC's decision to dismiss NCFA's petition based on lack of standing is reversed.

REVERSED.

JUDGE MARTIN concur.

JUDGE TYSON dissents.

TYSON, Judge, dissenting.

The trial court did not err in holding that petitioner had standing. I respectfully dissent.

## I. Issues

The issue presented by respondents in their cross-assignment of error is whether petitioner had standing to commence a contested case proceeding under the North Carolina Administrative Procedure Act ("NCAPA").

The issues presented by petitioner are whether the superior court (1) erred in concluding that the Environmental Management Commission's, ("EMC"), final agency decision was timely, (2) applied the correct standard of review in determining that respondent had "absolute power" under the statute, (3) applied the correct standards of statutory construction in determining respondent's statutory authority, (4) erred in failing to address whether respondent failed to act as required by law, (5) erred in failing to address whether respondent acted arbitrarily and capriciously and without substantial evidence in support of its decision to exclude wood chip mills from General Permit No. NCG210000, and (6) erred in failing to rule on motions to correct and supplement the record.

I would affirm in part and reverse in part the order of the superior court, and remand for further proceedings.

## II. Standing

Respondents contend that the superior court erred in concluding that petitioner had standing to commence a contested case proceeding as a "person aggrieved" under § 150B-22 of the North Carolina Administrative Procedure Act ("NCAPA"). N.C. Rule of Appellate Procedure 10(d) permits an appellee, without taking an appeal, to cross-assign as error an act or omission of the lower court which deprives appellee of an alternative legal ground for supporting the judgment in its favor. *Carawan v. Tate*, 304 N.C. 696, 286 S.E.2d 99 (1982).

The NCAPA provides that "[a]ny person aggrieved may commence a contested case hearing hereunder." N.C.G.S. § 150B-23(a) (2001). The contested case hearing provisions apply to all agencies and all proceedings except those expressly exempted therefrom, and specifies the extent of such exemption. N.C.G.S. § 150B-1 (2001); *see also Empire Power Co. v. North Carolina Dep't of E.H.N.R.*, 337 N.C.

569, 447 S.E.2d 768 (1994) (for a detailed analysis of standing under the NCAPA and the Water and Air Resources Act where third-party petitioner appealed the decision of EMC to grant an air pollution control permit). The General Assembly has not expressly exempted the Department of Environment and Natural Resources, ("DENR") from a contested case hearing in administering the stormwater permitting process.

### A. "Person Aggrieved"

Petitioner argues that it is a "person aggrieved" as defined by the NCAPA and our Supreme Court. I agree with the majority's opinion that "NCFA is entitled to a contested case hearing if it is a 'person aggrieved'[,]" and the organic statute, in this case N.C.G.S. § 143-215.1, does not exclude petitioner from those entitled to appeal under the statute. *Empire Power Co.* at 588, 447 S.E.2d at 779 ("Under the NCAPA, any 'person aggrieved' within the meaning of the organic statute is entitled to an administrative hearing to determine the person's rights, duties, or privileges.")

" 'Person aggrieved' means any person or *group of persons of common interest directly or indirectly affected* substantially in his or its person, property, or employment, by an administrative decision.' " *Id.* (citing N.C.G.S. § 150B-2(6) (2001)). (Emphasis supplied). Our Supreme Court has interpreted "person aggrieved" expansively:

> The expression "person aggrieved" has no technical meaning. What it means depends on the circumstances involved. It has been variously defined: "Adversely or injuriously affected; damnified, having a grievance, having suffered a loss or injury, or injured; also having cause for complaint. More specifically the word(s) may be employed meaning adversely affected in respect of legal rights, or suffering from an infringement or denial of legal rights."

*Id.* (citations omitted).

Petitioner alleges that the removal of new and expanding wood chip mills from a general permit adversely affects them, because chip mills are now required to apply for and obtain individual permits. What was once a "generally" permitted operation by submission of a "Notice of Intent" and issuance of a "Certificate of Coverage" is now denied. Petitioner argues that this change subjects them to additional time consuming and costly burdens to seek individual permits.

General Permit NCG040000 included wood chip mills. This general permit expired in August 1997. In April 1998, respondent DENR issued a new permit, General Permit No. NCG210000. Petitioner has appealed the issuance of a permit and not a "discretionary authority to require more extensive documentation" as argued by respondent DENR. The new general permit requirement excludes activities once included, and adversely affects the rights of a "group of persons of common interest," represented by petitioner. *Id.* Under the facts of this case, I agree with the trial court and the Administrative Law Judge, ("ALJ") and would hold that petitioner is a "person aggrieved" as that term has been defined by the NCAPA and by our Supreme Court. As a "person aggrieved," petitioner has standing to commence a contested case proceeding.

### B. "Licensing"

Petitioner also has standing because the action complained of concerns a "licensing." Under the NCAPA's definition of a "contested case," any action involving a "licensing" is a contested case. N.C.G.S. § 150B-2(2) (2001). The new permit, General Permit No. NCG210000 is a "license." The NCAPA defines "license" as "any certificate, *permit*, or other evidence, by whatever name called, of a right or privilege to engage in any activity. . . ." N.C.G.S. § 150B-2(3) (2001). (Emphasis added).

Whether the EMC's decision is considered an "issuance with an unsatisfactory term" as petitioner argues, or a "decision not to issue" as respondents contend, either decision remains a "licensing" under the NCAPA. N.C.G.S. § 150B-2(4) defines "licensing" as "an administrative action issuing, *failing to issue*, suspending, or revoking a license . . ." (Emphasis added). Because wood chip mills were previously included under General Permit NCG210000, the exclusion of chip mills from the subsequent General Permit NCG210000 was a "failure to issue" a permit for the chip mills. A decision to issue or not to issue a "license", "certificate", or "permit" under the NCAPA gives rise to a contested case for which petitioner has standing. (*See* N.C.G.S. § 150B-2(3) (2001)).

The majority's opinion states: "[s]ignificantly, this statute does not require the EMC to make general permits available." Whether the issuance of a permit is ministerial or discretionary is immaterial to whether the plaintiff is a "person aggrieved" for standing. Once the EMC decided to issue the permit, the NCAPA specifically provides that petitioner as a "group of persons of common interests" was

adversely affected by the EMC's decision. N.C.G.S. § 150B-2(6). The majority's position is even more unusual since the State admits in its brief that ". . . the statute does confer the right on permittees and permit applicants to challenge a permit denial or a permit condition (N.C.G.S. § 143-215.1(e))."

The majority's opinion also cites N.C.G.S. § 143-215.1(e) to limit the right of review to a "permit applicant or permittee." Petitioner's standing as a "person aggrieved" arises under the NCAPA, N.C.G.S. § 150B, and not under N.C.G.S. § 143. The NCAPA provides that petitioner is a "group of persons of common interests" who are all, as the majority's opinion quotes, "permitee[s] who [are] dissatisfied with a decision of the Commission[.]" N.C.G.S. § 150B-2(6).

Respondents' arguments and cross-assignment of error were correctly decided by the superior court and should be overruled. That portion of the superior court's order should be affirmed. As I would hold that petitioner has standing, I address petitioner's assignments of error.

### III. Final Agency Decision

#### A. Timeliness

Petitioner argues that: (1) the final agency decision of the EMC was not issued in a timely manner as required by N.C.G.S. § 150B-44 and (2) the NPDES Committee does not have statutory authority to render a final agency decision for the EMC. Petitioner contends that the recommended decision of the ALJ in favor of petitioner became the final agency decision. I disagree.

The statute as it existed then provided in pertinent part:

An agency that is subject to Article 3 of this Chapter and is a board or commission has 90 days from the day it receives the official record in a contested case from the Office of Administrative Hearings or 90 days after its next regularly scheduled meeting, whichever is longer, to make a final decision in the case. *This time limit may be extended by the parties or, for good cause shown, by the agency for an additional period of up to 90 days.* If an agency subject to Article 3 of this Chapter has not made a final decision within these time limits, the agency is considered to have adopted the administrative law judge's recommended decision as the agency's final decision. Failure of an agency subject to Article 3A of this Chapter to make a final decision within 180 days

of the close of the contested case hearing is justification for a person whose rights, duties, or privileges are adversely affected by the delay to seek a court order compelling action by the agency or, if the case was heard by an administrative law judge, by the administrative law judge.

N.C.G.S. § 150B-44 (1999) (emphasis supplied) (the legislature has amended the time requirements effective January 1, 2001).

In *Occaneechi Band of the Saponi Nation v. N. C. Comm'n of Indian Affairs*, 145 N.C. App. 649, 551 S.E.2d 535 (2001), this Court interpreted the time limits of N.C.G.S. § 150B-44 to be self-executing. "The plain language of G.S. § 150B-44 provides that an agency subject to Article 3 of this chapter . . . has 90 days from the day the official record is received by the Commission or 90 days after its regularly scheduled meeting, whichever is longer, to issue its final decision in the case." *Id.* at 653, 551 S.E.2d at 538. The first 90 days may be extended for an additional 90 days under two specific circumstances: "(1) by agreement of the parties and (2) for good cause shown." *Id.* (citing N.C.G.S. § 150B-44). We held that "the statute is clear that if a final decision has not been made 'within these time limits' the agency is considered to have adopted the ALJ's recommended decision." *Id.*

At bar, it is undisputed that the EMC received the recommended decision and official record from the Office of Administrative Hearings on 4 May 1999 and that its next regularly scheduled meeting was 13 May 1999. Under the statute, EMC had until 11 August 1999 to issue its final decision under the first 90 day time limit. On 14 July 1999, EMC notified the parties in writing that the matter would be scheduled for hearing at either the 13 October or 14 October 1999 EMC meeting. Petitioner made no objection to this notice or the hearing dates.

Sometime after 11 August 1999, the chairman of EMC, by order entered *nunc pro tunc* to 10 August 1999, extended the time period for making a final agency decision for an additional 90 days. This order recited that the hearing of the matter being scheduled for a decision at the 13 October 1999 meeting was the "good cause shown." The parties received the order on 27 August 1999. Petitioner did not object either to the hearing date nor the order extending the time limit. Petitioner participated in the hearing held on 13 October 1999 without objection. With the extension, EMC's deadline to issue its final decision became 9 November 1999. The final agency decision was issued on 5 November 1999.

Petitioner contends that an "after the fact extension" by an order *nunc pro tunc* is not provided for under N.C.G.S. § 150B-44. Here, there is no need to address the issue of whether an agency may extend the time limits under N.C.G.S. § 150B-44 in this manner. Petitioner raised its timeliness argument for the first time on appeal in superior court. Petitioner has waived any objection to the extension. "A litigant may not remain mute in an administrative hearing, await the outcome of the agency decision, and, if it is unfavorable, then attack it on the ground of asserted procedural defects not called to the agency's attention when, if in fact they were defects, they would have been correctible." *Nantz v. Employment Sec. Comm'n of N.C.*, 28 N.C. App. 626, 630, 222 S.E.2d 474, 477 (1976) (citing *First-Citizens Bank and Trust Co. v. Camp*, 409 F.2d 1086 (4th Cir. 1969)). Petitioner waived its timeliness argument by failing to object until after the EMC hearing. That portion of the superior court's order affirming the timeliness of EMC's final agency decision was correct.

### B.  Delegation of Authority

Petitioner further argues that the NPDES Committee does not have statutory authority to render a final agency decision for the EMC. Petitioner contends that N.C.G.S. § 150B-36(b) requires that a final agency decision in a contested case be made by the agency, and that the NPDES Committee is not an "agency" as that term is defined in the statute. I disagree. *See* N.C.G.S. § 150B-2(1a) (2001) (Agency is defined as "an agency or an officer in the executive branch of the government of this State and includes the Council of State, the Governor's Office, a board, a commission, a department, a division, a council, and any other unit of government in the executive branch.").

The Congress of the United States authorized the Environmental Protection Agency ("EPA") to establish effluent limitations for pollutants and toxic waste discharges by industry, agricultural operations and public and private waste treatment facilities. All public and private organizations which discharge wastes through point sources are required to obtain a NPDES permit. 33 U.S.C. § 1342 (1994). Individual states have been authorized to assume responsibility for administration of the NPDES permit system upon enacting state statutory authorization and application to the EPA. 33 U.S.C. § 1342(b) (1994).

Our General Assembly amended the Water and Air Resources Act in order to obtain state administration of the NPDES permit system. 1973 N.C. Sess. Laws ch. 1262, § 23. N.C.G.S. § 143-211 states

the public policy underlying the Water and Air Resources Act is "to provide for the conservation of its water and air resources." N.C.G.S. § 143-211(a) (2001). The statute confers upon the Department of Environment and Natural Resources authority "to administer a complete program of water and air conservation, pollution abatement and control . . ." and states that "the powers and duties of the Environmental Management Commission and the Department of Environment and Natural Resources be construed so as to enable the Department and Commission to qualify to administer federally mandated programs of environmental management . . . ." N.C.G.S. § 143-211(c) (2001).

N.C.G.S. § 143-215.3(a)(4) (2001) grants the EMC the power "[t]o delegate such of the powers of the [EMC] as the [EMC] deems necessary to one or more of its members, to the Secretary or any other qualified employee of the [DENR]." Pursuant to this statutory provision and federal regulations, EMC adopted Resolution 74-44 which appointed a five member committee to hear appeals of decisions or orders of designated hearing officers regarding NPDES permits, in lieu of the full EMC. Committee members are required to comply with federal requirements for membership contained in 40 C.F.R. 123.25(c). As a result, the NPDES Committee, consisting of five members of the EMC, was delegated the authority to render a final agency decision concerning petitioner's appeal.

Petitioner contends that EMC Resolution 74-44 is invalid. Petitioner argues the resolution preceded adoption of N.C. Admin. Code tit. 15A, r. 2A.0007 (a) creating the NPDES Committee and that the resolution has not been readopted by EMC or incorporated into the rule. The General Assembly specifically conferred upon EMC the statutory authority to delegate those powers it deemed necessary. *See* N.C.G.S. § 143-215.3. The statute as it existed in 1974 provided the same authority to delegate as the present statute. EMC is not required to readopt or pass a new resolution absent a change in the statute that confers such authority.

## IV.  Standard of Review

Petitioner argues that the superior court misinterpreted N.C.G.S. § 143-215.1 as granting respondent DENR "absolute power to issue or not to issue a general permit for any class of activities whatsoever." Petitioner asserts that the superior court failed to apply the proper standard of review of a final agency decision that petitioner contends was arbitrary and capricious. I agree.

Petitioner initially argues that *de novo* review applies to all issues, but subsequently argues that respondents' decision should be reviewed under an arbitrary and capricious standard. Judicial review of an administrative agency decision is governed by the North Carolina Administrative Procedure Act (APA), codified at Chapter 150B of the General Statutes. *Henderson v. North Carolina Dep't. of Human Resources*, 91 N.C. App. 527, 372 S.E.2d 887 (1988).

The superior court is authorized to reverse or modify an agency's final decision:

> if the substantial rights of the petitioners may have been prejudiced because the agency's findings, inferences, conclusions, or decisions are:
>
> (1)  In violation of constitutional provisions;
>
> (2)  In excess of the statutory authority or jurisdiction of the agency;
>
> (3)  Made upon unlawful procedure;
>
> (4)  Affected by other error of law;
>
> (5)  Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
>
> (6)  Arbitrary, capricious, or an abuse of discretion.

N.C.G.S. § 150B-51(b) (2001). The proper standard of review to be utilized by the superior court is determined by the particular issues presented on appeal. *ACT-UP Triangle v. Commission for Health Servs.*, 345 N.C. 699, 706, 483 S.E.2d 388, 392 (1997) (citing *Amanini v. North Carolina Dep't of Human Resources*, 114 N.C. App. 668, 674, 443 S.E.2d 114, 118 (1994)). If the petitioner contends the agency decision is affected by an error of law, *de novo* review is the proper standard of review under N.C.G.S. § 150B-51(b)(1)-(4). *Dillingham v. North Carolina Dep't. of Human Resources*, 132 N.C. App. 704, 708, 513 S.E.2d 823, 826 (1999).

The whole record test is the proper standard of review, if petitioner contends the agency decision is not supported by substantial evidence, under N.C.G.S. § 150B-51(b)(5), or was arbitrary and capricious or constituted an abuse of discretion, under N.C.G.S. § 150B-51(b)(6). *Id.* The reviewing court may be required to utilize both standards of review if warranted by the nature of the issues

raised on appeal. *In re Appeal by McCrary*, 112 N.C. App. 161, 165, 435 S.E.2d 359, 363 (1993).

These standards of review are distinct. *De novo* review requires the court to " 'consider a question anew, as if not considered or decided by the agency' previously. . . ." and to "make its own findings of fact and conclusions of law . . ." rather than relying upon those made by the agency. *Jordan v. Civil Serv. Bd. of Charlotte*, 137 N.C. App. 575, 577, 528 S.E.2d 927, 929 (2000) (citation omitted). On the other hand, "[t]he 'whole record' test requires the reviewing court to examine all competent evidence (the 'whole record') in order to determine whether the agency decision is supported by 'substantial evidence.' " *Amanini*, 114 N.C. App. at 674, 443 S.E.2d at 118. "Substantial evidence is that which a reasonable mind would regard as adequately supporting a particular conclusion." *Walker v. North Carolina Dep't of Human Resources*, 100 N.C. App. 498, 503, 397 S.E.2d 350, 354 (1990) (citation omitted).

This Court's scope of appellate review of a superior court order regarding an agency decision is: "the appellate court examines the trial court's order for error of law." *Amanini*, 114 N.C. App. at 675, 443 S.E.2d at 118-19 (citing *In re Kozy*, 91 N.C. App. 342, 344, 348, 371 S.E.2d 778, 780, 782 (1988), *disc. review denied*, 323 N.C. 704, 377 S.E.2d 225 (1989)). "The process has been described as a twofold task: (1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly." *Id.* (citations omitted).

Petitioner alleged that the final agency decision exceeded statutory authority and was arbitrary and capricious. The superior court was required to employ both a *de novo* review for errors of law, and a whole record review to determine whether the decision was arbitrary and capricious. The order initially states that the court "considered the record, the briefs of all parties and the oral arguments of the parties." The order then states that it is based on the "existing record." Later, the order reverses conclusions of law denominated as numbers one and two of the final agency decision, stating that these conclusions "are affected by error of law." This later language implies the court conducted a *de novo* review. There are no findings of fact and no delineation by the superior court between when it applied a *de novo* or whole record review. It is difficult to ascertain what standard of review the court utilized or whether the appropriate standard of review was applied to each allegation and conclusion of law.

Judicial review under any standard is meaningless if, as the court found, an agency has "absolute power." Except as to petitioner's standing to contest the agency's decision and that the EMC's order was timely rendered, the remaining portion of the superior court's order should be reversed and remanded for delineation of the appropriate standard of review of plaintiff's claims. *See Sun Suites Holdings, LLC v. Board of Aldermen of Garner,* 139 N.C. App. 269, 272, 533 S.E.2d 525, 527-28 (2000) ("The trial court, when sitting as an appellate court to review a [decision of a quasi-judicial body], must set forth sufficient information in its order to reveal the scope of review utilized and the application of that review.") (citations omitted).

## V. Summary

I would affirm that portion of the trial court's order that found: (1) the petitioner is a "person aggrieved" with standing to commence a contested case proceeding, and (2) EMC's November 5, 1999 order was a final agency decision that was timely rendered and the ALJ's recommended decision did not become the final agency decision.

As to the remaining portion of the superior court's order, I would reverse and remand this case to the superior court to (1) characterize the issues before the court, (2) clearly delineate the standard of review used, (3) resolve each motion or issue raised by the parties, and (4) enter findings of fact and conclusions of law thereon consistent with this opinion.